**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

JANE DOE and JOHN DOE,

Plaintiffs,

v.

ATHENA HEALTH, INC.

Defendant.

Case No. ______________________

JURY TRIAL DEMANDED

# CLASS ACTION COMPLAINT

Plaintiffs Jane Doe and John Doe, on behalf of themselves and all others similarly situated patients, upon personal knowledge as to Plaintiffs' own conduct and upon information and belief as to all other matters based upon investigation of counsel, such that each allegation has evidentiary support or is likely to have evidentiary support upon further investigation and discovery, and for their Class Action Complaint against Athena Health, Inc. ("Defendant" or "Athena Health"), state as follows:

## NATURE OF THE ACTION

1. Plaintiffs, individually and on behalf of all members of the proposed class (the "Class Members") bring this action against Athena Health for surreptitiously divulging her health information to Google via Google's online marketing systems, known as Google Analytics, when patients exchanged communications with their healthcare providers via Patient Portals provided by Athena Health (the "Patient Portals"). Athena Health similarly deployed Google analytics technology within the patient portal mobile application it offered patients that shared data with Google (the "Mobile

Application.") Athena Health did so without patients' knowledge, authorization, or consent.

2. Athena Health is one of the largest providers of health information technology services in the United States, providing patient portal access to millions of patients. Athena Health hosts online Patient Portals for healthcare providers across the country and similarly provides a patient portal mobile application, both of which allow patients to manage their healthcare online by, *e.g.*, viewing medical records, scheduling appointments, and messaging members of their care team.

3. As a Patient Portal provider, Athena Health operates as a "business associate" under HIPAA, which requires Athena Health to maintain patients' Protected Health Information in a manner consistent with HIPAA regulations ("Protected Health Information" or "PHI").[1] In addition to HIPAA, Athena Health is obligated to maintain the confidentiality of Protected Health Information under state and federal law.

4. Despite these obligations, and unbeknownst to patients, Athena Health deployed various third-party analytics technologies, including Google digital marketing and automatic rerouting tools, on its Patient Portals and Mobile Application. Via these tools, Athena Health purposefully and intentionally disclosed patients' Protected Health Information to third parties who exploited the information and used it for advertising. By using these tools, Athena Health took patients' confidential communications and Protected Health Information and automatically sent them to Google and other

[1] Under HIPAA, "Protected Health Information" means "individually identifiable health information: (1) Except as provided in paragraph (2) of this definition, that is: (i) Transmitted by electronic media; (ii) Maintained in electronic media; or (iii) Transmitted or maintained in any other form or medium." 45 C.F.R. § 160.103. HIPAA defines "Individually Identifiable Health Information" to mean "information that is a subset of health information, including demographic information collected from an individual, and: (1) Is created or received by a health care provider, health plan, employer, or health care clearinghouse; and (2) Relates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual; and (i) That identifies the individual; or (ii) With respect to which there is a reasonable basis to believe the information can be used to identify the individual.").

third parties—a clear violation of patients' reasonable expectations of privacy, their rights as patients, and their rights under federal and state law.

5. Athena Health's conduct violates reasonable expectations of patient privacy. Athena Health did not provide patients with any warnings that using its Patient Portals would result in Athena Health divulging their Protected Health Information and the substance of their communications with their healthcare providers to Google and its advertising systems.

6. There is no dispute that Athena Health's conduct is unlawful. In December 2022, the Office of Civil Rights at the United States Department of Health and Human Services ("HHS") issued a bulletin ("the Bulletin") reminding both covered entities and business associates alike of their patient privacy obligations "when using online tracking technologies."[2] HHS expressly stated that "[t]racking on user-authenticated webpages … such as a patient or health plan beneficiary portal" must comply with the HIPAA privacy rule and all information relating to such use by patients must be "protected and secured in accordance with the HIPAA Security Rule."[3] HHS further clarified that health information cannot be shared with "tracking technology vendors" unless they have signed a "business associate agreement (BAA)" to ensure that health information is "protected in accordance with HIPAA."[4]

---

[2] *See* Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.
[3] *Id.*
[4] *Id.*

7. Similarly, Google warns entities like Athena Health who provide password protected patient portals that Google Analytics should not be deployed on "authenticated" pages—*i.e.,* pages requiring patient logins:[2]

> ### Can Google Analytics be used in compliance with HIPAA?
>
> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA-covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages..
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

8. Despite Plaintiffs' and Class Members' reasonable expectations that Athena Health would not share their Health Information with Google and other third parties via the use of marketing tools, Athena Health routinely divulged patients' information anyway.

9. Athena Health did so through a multi-step process.

a. *First*, Athena Health required patients to have first-party cookies enabled to access its "secure" Patient Portals. This requirement is a general security and usability standard for "authenticated" websites. First-party cookies are typically used to confirm that the user is who they say they are when they sign-in—and to keep them signed-in as they exchange

communications within "authenticated" portions of a website.

b. *Second*, Athena Health placed, enabled, or permitted the placement of Google source code on its Patient Portals and inside the patient portal mobile application that it made available to the public.

c. *Third*, when a patient visited Athena Health's Patient Portals or clicked to login to a Patient Portal, the Google source code that Athena Health deployed enabled Google cookies to be placed on a patient's communications device that were disguised as "first-party" cookies belonging to Athena Health or the healthcare provider. By disguising the Google cookies, Athena Health prevented patients from blocking the deposit of the Google cookies through the use of third-party cookie blockers. In addition, because Athena Health required the use of first-party cookies to access the portal, Athena Health assured that all patients who entered its Patient Portals would have the Google cookies placed on their device.

d. *Fourth,* the Google source code that Athena Health deployed in its Patient Portals both captured patients' communications and commanded patients' computing devices to re-direct and divulge patient and device identifiers and the content of patient communications to Google via its various marketing services.

e. *Fifth,* both Athena Health and Google used this information for marketing purposes.

10. Athena Health did not make any attempt to obtain Plaintiffs' or Class Members' consent for sharing patients' protected PHI with Google nor does Athena Health have express written

consent from any Plaintiff or Class Member to share their Protected Health Information with Google.

11. Athena Health's unauthorized disclosures violate both state and federal law. Moreover, through its unauthorized disclosures, Athena Health breached its fiduciary duties, was unjustly enriched, and committed multiple torts and crimes, including criminal violations of the Electronic Communications Privacy Act. As courts have found across the country, violating these privacy rights harms patients, as it misappropriates their rights to control how information about them is distributed and exploits the value their health data in the marketplace. *Doe v. Virginia Mason Medical Center*, 2024 WL 3517759 (Wash. Super.) ("If it did not have value, then entire industries that sell and trade this data would not exist").

12. Athena Health's conduct caused damage to Plaintiffs and Class Members:

a. Sensitive and confidential Protected Health Information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Athena Health eroded the essential confidential nature of the provider-patient relationship;

c. Athena Health took something of value (*i.e.*, personal and private Protected Health Information and other personal data), from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' or Class Members' knowledge, informed consent, or authorization, and without sharing the benefit derived; and

d. Athena Health's actions diminished the value of Plaintiffs' and Class Members' Protected Health Information and other personal data.

**PARTIES TO THE ACTION**

13. Plaintiff Jane Doe is a resident of Burlington County, New Jersey who has been a registered user of an Athena Health Patient Portal operated by Athena Health and has regularly logged into the Athena Health Patient Portal

since becoming a user more than four years ago. Plaintiff Jane Doe has used the Athena Health Patient Portal in connection with medical care that she received from Capital Health. Plaintiff Jane Doe has used the Athena Health Patient Portal to review test results and doctor's notes related to her treatment for deep vein thrombosis and diabetes, search for treatment information related to deep vein thrombosis, and send messages to her healthcare providers related to her deep vein thrombosis and diabetes treatments.

14. Plaintiff John Doe is a resident of Middlesex County, Massachusetts who has been a registered user of an Athena Health Patient Portal operated by Athena Health and has regularly logged into the Athena Health Patient Portal since becoming a user more than four years ago. Plaintiff John Doe has used the Athena Health Patient Portal in connection with medical care that he received from his primary care physician and other specialists associated with Heywood Hospital in Massachusetts. Plaintiff John Doe used the Athena Health Patient Portal to review test results and doctor's notes related to his treatment for neuropathy, schedule appointments with treating physicians, and send messages to his doctors.

15. Defendant Athena Health, Inc. is a Massachusetts corporation with its principal place of business at 80 Guest Street, Boston, Massachusetts, 02135. Athena Health supplies electronic health record ("EHR") products and provides Patient Portals for healthcare providers nationwide, including Henry Ford Health System (MI), Heywood Healthcare (MA), Michigan State University Health (MI), Capital Health (NJ), and Augusta Health (VA), and Summit Health (NY). Via this technology, Athena Health manages millions of unique patient charts.

**JURISDICTION AND VENUE**

16. This Court has jurisdiction over this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332, because: (a) this is a proposed class action in which there are at least 100 Class Members; (b) the parties are minimally diverse, as at least one member of the proposed Class is domiciled in a different state than at least one Defendant; and (c) the combined claims of Class members exceed $5,000,000, exclusive of interest, attorneys' fees, and costs. This Court also has jurisdiction over this

action pursuant to 28 U.S.C. § 1331 because the action arises under the laws of the United States, including the Electronic Communications Privacy Act ("ECPA").

17. This Court additionally has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367(a), because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

18. This Court has personal jurisdiction over Athena Health because Athena Health has sufficient minimum contacts with this District in that it operates and markets its services throughout this District.

19. Venue is also appropriate in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL BACKGROUND

### A. Athena Health Systematically and Routinely Disclosed Patients' Protected Health Information to Third Parties, including Google.

20. Plaintiffs and Class Members are patients who have used password-protected Athena Health Patient Portals.

21. Healthcare providers and their business associates like Athena Health have fiduciary, common law, and statutory duties to protect the confidentiality of their patients' Protected Health Information and to refrain from making unauthorized disclosures to third parties about their patients' Protected Health Information.

22. Medical patients like Plaintiffs and Class Members have a legal interest in preserving the confidentiality of their communications with healthcare providers.

23. Patients also have reasonable expectations of privacy that their Protected Health Information will not be disclosed to third parties without their express written consent and authorization.

24. Athena Health operates Patient Portals for hundreds of healthcare providers and health

care systems across the United States, including

25. Athena Health encourages patients to use digital tools on its Patient Portals and Mobile Application to seek and receive health care services.

26. Athena Health's Patient Portals are designed for interactive communication with patients, including scheduling appointments, searching for physicians, paying bills, reviewing medical records and lab results, exchanging communications with providers, and renewing prescriptions. Source code on Athena Health's Patient Portals causes these communications to be intercepted and disclosed to Google.

27. Notwithstanding patients' reasonable expectations of privacy and Athena Health's legal duties, Athena Health systematically and routinely disclosed patients' Protected Health Information, including the contents of patients' communications with their healthcare providers, via automatic data collection mechanisms embedded in its Patient Portals and Mobile Application. Athena Health did this without Plaintiffs' or other patients' knowledge, authorization, or consent. In doing so, Athena Health continuously and systematically violated the medical privacy rights of Plaintiffs and Class Members by causing the unauthorized disclosure of their communications to third parties like Google.

28. Athena Health also actively encouraged its healthcare clients to deploy their own Google Analytics tracking technologies on the Athena Patient Portals, with the result that a patient who logged into an Athena Health Patient Portal often had their patient status and other Protected Health Information shared multiple times via Google Analytics technologies.

29. Plaintiffs and Class Members provided their private Protected Health Information through Athena Health's Patient Portal and Mobile Application with the reasonable understanding that Athena Health would secure and preserve the confidentiality of that information, consistent with its legal obligations.

30. The Protected Health Information of Plaintiffs and Class Members has been—and likely will be—further disseminated to additional third parties that utilize the information for retargeting.

31. Athena Health intentionally incorporated analytics tracking tools into its Patient Portal and Mobile Application and never disclosed to Plaintiffs and Class Members that it shared their Protected Health Information with Google and other third parties. Nor did Athena Health inform patients that it was permitting Google to exploit their Protected Health Information for marketing purposes. As a result, Plaintiffs and Class Members were unaware that their Protected Health Information was being surreptitiously transmitted to Google when they visited Athena Health's Patient Portal.

32. The tracking tools that Athena Health uses on its Patient Portals and Mobile Application are—by design—invisible to patients. Once integrated into a website, the tracking tools are executed in the background, meaning that they can operate in the background on a website or a mobile application without ever alerting website users of their presence. Further, because of how these tools are designed, they are able to collect, store, and transmit user data in ways that cannot be blocked by "ad blocker" software or by a user refusing to give their consent to data being collected.

33. By using data collected by analytics tracking tools, Google is able to connect a website user's data to their real-world identity by linking their data to profiles maintained by Google, including user's Google accounts.

34. Once Google connects a user's data to their real-world identity, Google processes, analyzes, and assimilates that data so that it can be sold to online advertisers and funneled back to clients like Athena Health in the form of aggregated analytics data.

35. Online advertisers—taking advantage of Google's trove of personally identifying data—are able to create marketing campaigns that target their advertisements towards specific users

36. Athena Health did not warn or otherwise disclose to Plaintiffs and Class Members that Athena Health bartered their Protected Health Information to Google and other third parties for marketing purposes.

37. Plaintiffs and Class Members never consented, agreed, or otherwise authorized Athena Health to disclose their Protected Health Information to advertising companies like Google.

38. Upon information and belief, Athena Health intercepted and disclosed at least the following Protected Health Information to third parties including Google:

a. Plaintiffs' and Class Members' status as patients;

b. Plaintiffs' and Class Members' use of Athena Health's Patient Portals;

c. Information related to Plaintiffs' and Class Members' requests for, receipt of, and communications regarding medical treatment, including their review of lab and test results, medications, appointments, and communications with their treating physicians.

39. Athena Health interfered with Plaintiffs' and Class Members' privacy rights when it implemented technology (including Google Analytics) that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' Protected Health Information to Google and other third parties.

40. Athena Health also breached its obligations to patients in multiple other ways, including (1) failing to obtain their consent to disclose their Protected Health Information to third parties, (2) failing to adequately review its marketing programs and web-based technology to ensure its Patient Portals were safe and secure, (3) failing to remove or disengage software code that was known and designed to share Plaintiffs' and Class Members' Protected Health Information with third parties if placed inside Athena Health's Patient Portals, (4) failing to take steps to block the transmission of Plaintiffs' and Class Members' Protected Health Information to third-party advertising

companies, (5) failing to warn Plaintiffs and Class Members that Athena Health was routinely bartering their Protected Health Information to Google, and (6) otherwise ignoring Athena Health's common law and statutory obligations to protect the confidentiality of Plaintiffs' and Class Members' Protected Health Information.

41. The transmission of Plaintiffs' and Class Members' Protected Health Information to Google was not necessary for Athena Health's Patient Portal, Mobile Application, or other services to function. Indeed, the entire publicly stated purpose of those services was to facilitate the provision of healthcare to Plaintiffs and other patients, and as described Athena Health was under unambiguous legal obligations to ensure that patients' Protected Health Information transmitted in that process remained confidential. Given its legal obligations, Athena Health did not and could not have had any permissible purpose for placing Google source code inside its Patient Portal and Mobile Application. Athena Health's primary, secret, and improper purpose in doing so was, instead, to allow Athena Health and Google to exploit patient Protected Health Information and communications for advertising and marketing purposes.

42. Upon information and belief, Athena Health's improper disclosure of Plaintiffs' and Class Members' Protected Health Information to Google has been ongoing for many years, and continues to this day. The time period during which Athena Health had Google Analytics operative in its Patient Portals, as further described and alleged in this complaint, shall be defined for all purposes herein as the "Class Period."

**B. Athena Health Set Up its Patient Portals to Permit the Surreptitious Capture and Disclosure of Patients' Protected Health Information to Third Parties like Google.**

43. Athena Health's Patient Portals are used by numerous healthcare providers around the United States and have been throughout the Class Period.

44. The Patient Portals provide patients and providers:

a. the ability to send and receive electronic communications;

b. computer storage of electronic health record and communications information; and

c. processing services for electronic information.

45. When a patient goes to a Athena Health Patient Portal to "Sign In," Google source code that Athena Health placed or permitted to be placed on its Patient Portals will deposit "first-party" cookies named _ga, _gid, _gcl, and _au on the patient's computing device. As "first party" cookies, the _ga, _gid, _gcl, and _au cookies are disguised as belonging to Athena Health, which will permit them to be placed on the patient's device. In fact, however, these are Google cookies, not Athena Health cookies.

46. By disguising the Google cookies as belonging to Athena Health instead of Google, Athena Health circumvents attempts to block such tracking.

47. Further, Athena Health ***requires*** patients to have first-party cookies enabled to access its Patient Portals, which further assures that Athena Health will be able to deposit Google cookies on patient computing devices while patients are on and inside Patient Portals.

48. Athena Health's software permitted the deployment of "custom analytics scripts" within the Patient Portals including, for example, Google Analytics, Google Ads, and Google DoubleClick source code (collectively, "Google source code"), through which patient identifiers and communications content were divulged to Google while patients are exchanging communications with their healthcare providers and while the communications content is in electronic storage within Athena Health's Patient Portals.

49. Athena Health knowingly and secretly deployed Google source code on Patient Portal login pages and inside its Patient Portals.

50. Further, Athena Health actively encouraged its healthcare clients to deploy Google marketing tools to drive patient engagement.

51. In short, the Google source code that Athena Health deployed on its Patient Portals deposited Google cookies on patients' browsers; disguised Google cookies as being associated with Athena Health rather than Google; and commanded Plaintiffs' and Class Members' browsers to re-direct identifiers and communications content on and inside the Patient Portals to Google. Further, Athena Health implemented multiple measures to ensure that Plaintiffs and Class Members would not and could not prevent all this from taking place.

52. The Google source code Athena Health deployed inside its Patient Portals intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' Protected Health Information to Google, including at least the following identifiers:

a. Patient IP addresses;

b. Unique, persistent patient cookie identifiers;

c. Device identifiers;

d. Account numbers;

e. URLs;

f. Other unique identifying numbers, characteristics, or codes; and

g. Browser-fingerprints.

50. The Google source code Athena Health deployed inside its patient portals intercepted patients' communications for the purpose of redirecting Plaintiffs' and Class Members' Protected Health Information to Google, including at least the following communications content:

a. Actions to log in to Patient Portals;

b. Actions to sign up for Patient Portals;

c. Actions to log out of Patient Portals;

d. Actions taken inside Patient Portals;

e. Any actions that patients take on their healthcare providers' properties

while logged in to Patient Portals, including searching or exchanging communications about a specific doctor, condition, or treatment.

f. Plaintiffs' and Class Members use of Athena Health's Mobile Application;

g. Plaintiffs' and Class Members' searches for information regarding specific conditions and treatments, their medical providers, and their physical location.

51. The amount of data collected is significant. When patients interacted with its Patient Portals, Athena Health disclosed a full-string, detailed URL to Google, typically containing the name of the website, folder, and sub-folders on the webserver; the name of the precise file requested; and the exact contents of the patients' communications. For example, when a patient clicks on a link to view a specific test result or make an appointment with a specific physician, Google receives the precise text of the patient's query.

52. Athena Health similarly deployed Google Firebase Code within the Mobile Application that Athena Health offered to the public, including as recently as April 2025. The deployment of this Google tracking technology on Athena Health's Mobile Application resulted in significant amounts of patients' personal data being shared with Google, including logins, page views, IP addresses, device properties (such as brand, model, and operating system), app events (such as screen views and notifications), marketing identifiers specific to the device, and device information, including geo-location information. The data provided by the tracking technologies that Athena Health deployed on these devices permitted Google to specifically identify the users and exploit their data for marketing purposes.

53. As a result of the foregoing, Google consistently received throughout the Class Period the precise text of communications that Plaintiffs and Class Members made about specific medical providers, treatments, conditions, appointments, tests, medications, payments, and registrations.

54. The contents of patients' communications with their treating physicians plainly relate to (and disclose) the past, present, or future physical or mental health or condition of individual patients who interact with Athena Health's Patient Portals. 45 C.F.R. § 160.103. Worse, no matter how sensitive the area of the portal site that a patient reviewed, the referral URL was acquired by Google along with other Protected Health Information embedded in patients' interactions with the Patient Portals.

55. The nature of the collected data is important. Athena Health's unauthorized disclosures resulted in Google's obtaining the comprehensive history of individual patients, no matter how sensitive their medical condition. Google was then able to correlate that history with other known information regarding the user, including their identity, their prior searches, the time of day, and other user actions. This process resulted in Google acquiring a vast repository of personal data about patients that was then used for marketing purposes—all without patients' knowledge, consent, or authorization, or any further action by patients.

56. By design, Google received the exact contents of patients' communications while they were in storage in Athena Health's systems but before the full response from the healthcare providers had been rendered on the screen of patients' devices.

57. As of the date of the filing of this complaint, Athena Health had Google's Firebase Analytics deployed on its Mobile Application as well as analytics technologies from LaunchDarkly, Amplitude, and OneSignal. Likewise, as of the date of the filing of this Complaint, Athena Health is also still sharing analytics data from inside its Patient Portal with multiple third parties, including via analytics technologies provided by Amplitude, Microsoft Application Insights, and LaunchDarkly.

### C. What Happened When Patients Communicated with Athena Health's Patient Portals.

58. During the Class Period, when patients logged-in to Athena Health's Patient Portals either through a website or via the Athena Health mobile application, Athena Health re-directed the precise content of the patients' communication and patients' identifiers to Google at various Google domains.

59. When patients signed-in or exchanged communications inside the portal, Athena Health immediately placed the content of that communication in storage within the Patient Portals.

60. Athena Health's immediate storage of the contents (and the identity of the person who was exchanging the communication) is required by federal law. *See* 45 C.F.R. § 164.312.

61. After Athena Health had stored the content of the communication, but while the Patient Portal exchange with patients was still occurring, Athena Health re-directed patients' information to the following Google domain: www.google-analytics.com.

62. The patient identifiers that were re-directed to Google-Analytics include:

a. The patient's IP address;

b. The patient's User-Agent information and other data that, when combined, is sufficient to uniquely identify the device; and

c. Google cookies disguised as Athena Health's cookies which serve as device identifiers and that Google connects to patients. These cookies include but

may not be limited to the _ga and _ga_HK3FDYQCRR cookies.

63. Google will always receive at least the device-identifying NID cookie regardless of whether a person is signed in to a Google Account. Regardless of a person's Google Account holder status, the NID cookie is a device identifier that is considered personally identifiable as a matter of law when the data includes protected Protected Health Information protected by federal law.

64. Further if a Google Account holder has signed-in to a Google Account on the device

in question and did not formally sign out before sending a separate communication to the Patient Portals, then Athena Health will re-direct both the device identifier cookie (IDE) and the Google Account identifying cookie (DSID). By re-directing both cookies at the same time, Athena Health enables Google to connect the IDE device-identifying cookie to specific Google Account holder such that, once Google has made the connection, it only needs to see the IDE cookie in order to connect a later re-directed communication with the specific Google Account holder.

### D. Athena Health's Actions Permitted Google to Connect Patients' Data Across Domains.

65. Google publicly states that it connects data that advertisers and publishers (like Athena Health here) send to it across the different Google Analytics, Google.com, and Doubleclick.net domains.

66. Athena Health uses the same tools and source code throughout Patient Portals. Thus, the types of Google cookies deposited on patient devices and the types of Protected Health Information and communications content disclosed (as explained above) occurred every time a patient logged into or took any action within the Patient Portals.

### E. Google's Business Model: Exploiting Consumers' Personal Information for Profit

67. By any measure, Google is the world's largest data company. Among other services, Google operates the world's most popular search engine (Google), email provider (Gmail), video website (YouTube), mapping service (Google Maps), Internet analytics service for web developers (Google Analytics), and web-browser (Chrome). It also operates various ad services that are among the world's most popular in their respective categories, including the advertising services of Google DoubleClick and Google AdWords.

68. Google Analytics has massive reach. As described by the Wall Street Journal, it is "far and away the web's most dominant analytics platform" and "tracks you whether or not you are logged

in."[5]

69. Google cookies provide personally identifiable data about patients who visit Athena Health's Patient Portals to Google. Athena Health transmits personally identifiable Google cookie data to Google.

70. Google specifically warns developers and advertisers that Google Analytics is not appropriate for HIPAA-covered entities like Athena Health, publicly stating:[6]

> Customers must refrain from using Google Analytics in any way that may create obligations under HIPAA for Google. HIPAA-regulated entities using Google Analytics must refrain from exposing to Google any data that may be considered Protected Protected Health Information (PHI), even if not expressly described as PII in Google's contracts and policies. Google makes no representations that Google Analytics satisfies HIPAA requirements and does not offer Business Associate Agreements in connection with this service.
>
> For HIPAA-regulated entities looking to determine how to configure Google Analytics on their properties, the HHS bulletin provides specific guidance on when data may and may not qualify as PHI. Here are some additional steps you should take to ensure your use of Google Analytics is permissible:
>
> - Customers who are subject to HIPAA must not use Google Analytics in any way that implicates Google's access to, or collection of, PHI, and may only use Google Analytics on pages that are not HIPAA- covered.
> - Authenticated pages are likely to be HIPAA-covered and customers should not set Google Analytics tags on those pages.
> - Unauthenticated pages that are related to the provision of health care services, including as described in the HHS bulletin, are more likely to be HIPAA-covered, and customers should not set Google Analytics tags on HIPAA-covered pages.
> - Please work with your legal team to identify pages on your site that do not relate to the provision of health care services, so that your configuration of Google Analytics does not result in the collection of PHI.

71. Google tracks Internet users with IP addresses, cookies, geolocation, and other unique

---

[5] *Who Has More of Your Personal Data than Facebook? Try Google*, The Wall Street Journal (April 22, 2018) (available at https://www.wsj.com/articles/who-has-more-of-your-personal-data- than-facebook-try-google-1524398401).

[6] Google, *HIPAA and Google Analytics,* https://support.google.com/analytics/answer/13297105?hl=en

device identifiers.

72. Google cookies are personally identifiable. For example, Google explains the following about certain cookies that it uses:

a. "[C]ookies called 'SID' and 'HSID' contain digitally signed and encrypted records of a user's Google account ID and most recent sign-in time."[7]

b. "Most people who use Google services have a preferences cookie called 'NID' in their browsers. When you visit a Google service, the browser sends this cookie with your request for a page. The NID cookie contains a unique ID Google uses to remember your preferences and other information[.]"[8]

c. "We use cookies like NID and SID to help customize ads on Google properties, like Google Search. For example, we use such cookies to remember your most recent searches, your previous interactions with an advertiser's ads or search results, and your visits to an advertiser's website. This helps us to show you customized ads on Google."[9]

d. "We also use one or more cookies for advertising we serve across the web. One of the main advertising cookies on non-Google sites is named 'IDE' and is stored in browsers under the domain doubleclick.net. Another is stored in google.com and is called ANID. We use other cookies with names such as DSID, FLC, AID, TAID, and exchange_uid. Other Google

[7] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210916060858/https:/policies.google.com/technologies/cookies?hl=en-US (archived from September 16, 2021).
[8] *Privacy & Terms, Types of Cookies Used by Google*, Google, http://web.archive.org/web/20210101020222/https:/policies.google.com/technologies/cookies?hl=en-US (archived from January 1, 2021).
[9] Id.

> properties, like YouTube, may also use these cookies to show you more relevant ads."[10]

73. Google warns web-developers that Google marketing tools are not appropriate for every type of website or webpage, including health-related webpages and websites.

74. Google also warns developers in its Personalized Advertising policies page that "Health in personalized advertising" is a "Prohibited category" for Google's personalized advertising tools. Specifically, Google's advertising policies page states:[11]

> We take user privacy very seriously, and we also expect advertisers to respect user privacy. These policies define how advertisers are allowed to collect user data and use it for personalized advertising. They apply to advertisers using targeting features, including remarketing, affinity audiences, custom affinity audiences, in- market audiences, similar audiences, demographic and location targeting, and keyword contextual targeting. …
>
> You aren't allowed to do the following:

> ⊗ Collect information related to sensitive interest categories (see Personalized advertising policy principles below for more about sensitive interest categories)

75. The United States Department of Health and Human Services has made clear that "it is insufficient for a tracking technology vendor to agree to remove PHI from the information it receives or to de-identify the PHI before the vendor saves the information. Any disclosure of PHI to the vendor without individuals' authorizations requires the vendor to have a signed BAA in place and requires that there is an applicable Privacy Rule permission for disclosure."[12]

76. Google refuses to sign business associate agreements ("BAA") with healthcare companies.

---

[10] Id.

[11] *Advertising Policies Help, Personalized Advertising*, Google, http://web.archive.org/web/20191031223446/https://support.google.com/adspolicy/answer/143465?hl=en (archived from October 31, 2019).

[12] Office for Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates* (Dec. 1, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html.

77. After Google collects data that is transmitted to it by Google Analytics, Google analyzes and processes that data for use in selling advertising.

78. Google also uses the data that it collects from tracking pixels to provide clients like Athena Health with analytics data that those clients use to bolster their marketing and advertising strategies. Clients like Athena Health also use the analytics data that they receive back from Google to optimize their websites. Athena Health benefited financially from sharing Plaintiffs' and Class Members' Protected Health Information via tracking pixels by receiving, among other things, better and more cost-effective marketing in exchange for patient data.

### F. Athena Health Shared a Trove of Personally Identifiable Information with Google.

**IP Addresses Are Personally Identifiable**

79. An IP address is a number that identifies a computer or other device (such as a mobile phone) connected to the Internet.

80. IP addresses are used to identify and route communications on the Internet.

81. IP addresses of individual Internet users are used by websites and tracking companies to facilitate and track Internet communications and target those users with advertising using IP addresses.

82. Under HIPAA, an IP address is considered personally identifiable information. See 45 C.F.R. § 164.514(b)(2)(i)(O).

83. Whenever a patient logged into or used Athena Health's Patient Portals, Athena Health caused the disclosure of the patient's IP addresses to Google, along with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

**Internet Cookies Are Personally Identifiable**

84. In the early years of the Internet, advertising on websites followed the same model

as traditional newspapers. Just as a sporting goods store would choose to advertise in the sports section of a traditional newspaper, advertisers on the early Internet paid for ads to be placed on specific web pages based on the type of content displayed on the web page.

85. Computer programmers eventually developed "cookies"—small text files that web servers can place on a person's device when that person's web browser interacts with the server. Cookies can perform different functions, like saving a user's login or other site settings. Eventually, some cookies were designed to acquire and record an individual Internet user's communications and activities on websites across the Internet.

86. Cookies are designed to and, in fact, most often do operate as means of identification for Internet users.

87. Cookies are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(H), (J), (M), (N), and (R).

88. In general, cookies are categorized by duration and party.

89. There are two types of cookies classified by duration:

a. "Session cookies" are placed on a user's computing device only while the user is navigating the website that placed and accesses the cookie. The user's web browser typically deletes session cookies when the user closes the browser.

b. "Persistent cookies" are designed to survive beyond a single Internet-browsing session. The party creating the persistent cookie determines its lifespan. As a result, a persistent cookie can acquire and record a user's Internet communications for years and over dozens or hundreds of websites. Persistent cookies are sometimes called "tracking cookies."

90. Cookies are also classified by the party that uses the collected data:

a. "First-party cookies" are set on a user's device by the website with which the user is exchanging communications. First-party cookies can be helpful to the user, server, and/or website to assist with security, log in, and functionality.

b. "Third-party cookies" are set on a user's device by website servers other than the website or server with which the user is exchanging communications. For example, the same patient who visits an Athena Health Patient Portal will typically also have cookies on their device from third parties, such as Google. Unlike first-party cookies, third-party cookies are not typically helpful to the user. Instead, third-party cookies are typically used for data collection, behavioral profiling, and targeted advertising.

91. Data companies like Google have developed methods for monetizing and profiting from cookies. These companies use third-party tracking cookies to help them acquire and record user data and communications to sell advertising that is customized to that person. To build individual profiles of Internet users, third-party data companies assign each user a unique identifier or set of unique identifiers.

92. Traditionally, first- and third-party cookies were kept separate. An Internet security policy known as the same-origin policy required web browsers to prevent one web server from accessing the cookies of a separate web server. For example, although Athena Health can deploy source code that uses Google third-party cookies to help Google acquire and record the patient's communications, they are not permitted direct access to Google third-party cookie values. The reverse is also true: Google was not provided direct access to the values associated with first-party cookies set by Athena Health.

93. Google designed a way to circumvent the same-origin policy so that third-party data

companies can gain access to first-party cookies—and Athena Health adopted it.

94. Javascript source code developed by third-party data companies and placed on a webpage by developers such as Athena Health can bypass the same-origin policy to send a first-party cookie value in a tracking pixel to the third-party data company. This technique is known as "cookie synching," and it allows two cooperating websites to learn each other's cookie identification numbers for the same user. Once the cookie synching operation is completed, the two websites can exchange any information they have collected and recorded about a user that is associated with a cookie identification number. The technique can also be used to track an individual who has chosen to use third-party cookie blockers.

95. Whenever a patient uses Athena Health's Patient Portals, Athena Health intercepts, uses, and causes the disclosure of patient cookie identifiers with each re-directed communication described herein, including patient communications about providers, conditions, treatments, appointments, bills, registration, and log-ins to the Patient Portals.

96. Athena Health's cookie disclosures include the deployment of cookie synching techniques through which Athena Health deposits Google cookies on patient computing devices by disguising the Google cookies as belonging to Athena Health.

97. Athena Health then re-directs the disguised Google cookies to Google.

**Browser-Fingerprints Are Personally Identifiable**

98. Browser-fingerprints are information collected about a computing device that can be used to identify the device.

99. Browser-fingerprints can be used to identify devices when the devices' IP addresses are hidden, and cookies are blocked.

100. The Electronic Frontier Foundation has explained:

> When a site you visit uses browser fingerprinting, it can learn enough information about your browser to uniquely distinguish you from all the

> other visitors to that site. Browser fingerprinting can be used to track users just as cookies do, but using much more subtle and hard-to-control techniques. In a paper EFF released in 2010, we found that a majority of users' browsers were uniquely identifiable given existing fingerprinting techniques. Those techniques have only gotten more complex and obscure in the intervening years. By using browser fingerprinting to piece together information about your browser and your actions online, trackers can covertly identify users over time, track them across websites, and building an advertising profile of them.[13]

101. In 2017, researchers showed that browser fingerprinting techniques can successfully identify 99.24 percent of Internet users.[14]

102. Browser-fingerprints are protected personal identifiers under HIPAA. 45 C.F.R. § 164.514(b)(2)(i)(M), (R).

103. Whenever patients use Athena Health Patient Portals, Athena Health intercepts, uses and causes disclosures of data sufficient to form browser fingerprints with each re-directed communication described herein, including patient communications concerning individual providers, conditions, and treatments.

104. Each of the individual data elements described above is personally identifiable on its own. However, Athena Health's disclosures of such personally identifiable data elements do not occur in a vacuum. The disclosures of the different data elements are tied together and, when taken together, are even more accurate in identifying individual patients, particularly when disclosed to data companies such as Google and other internet marketing companies that expressly state that they use such data elements to identify individuals and have developed sophisticated algorithms and infrastructure for doing so.

---

[13] Katarzyna Szymielewicz and Bill Dudington, *The GDPR and Browser Fingerprinting: How It Changes the Game for the Sneakiest Web Trackers*, Electronic Frontier Foundation (June 19, 2018) (available at https://www.eff.org/deeplinks/2018/06/gdpr-and-browser-fingerprinting-how-it-changes-game-sneakiest-web-trackers).

[14] Yinzhi Cao, Song Li and Erik Wijmans, *(Cross-)Browser Fingerprinting via OS and Hardware Level Features*, Proceedings of the Network and Distributed Security Symposium (March 2017) (available at https://yinzhicao.org/TrackingFree/crossbrowsertracking_NDSS17.pdf).

105. Athena Health knowingly discloses information that allows Google and other advertisers to link Plaintiffs' and Class Members' Protected Health Information to their private identities and target them with advertising. Athena Health intentionally shared the Protected Health Information of Plaintiffs and Class Members with Google in order to gain access to the benefits of Google Analytics.

106. The information Plaintiffs and Class Members provide to Athena Health via its Patient Portals website (which is then shared illegally with Google) can be combined with other information in Google's possession, like Plaintiffs' and Class Members' names, dates of birth, and phone numbers, to more effectively target Plaintiffs and Class Members with advertisements or sell their data to third parties.

107. Athena Health knew that by embedding Google Analytics—a Google marketing tool—in its Patient Portals, it was permitting Google to collect, use, and share Plaintiffs' and Class Members' Protected Health Information, including sensitive medical information and personally identifiable data. Athena Health was also aware that such information would be shared with Google simultaneously with patients' interactions with its Patient Portals. Athena Health chose to barter Plaintiffs' and Class Members' Protected Health Information to Google because it wanted access to Google Analytics and related Google tools. That bargain financially benefited Athena Health and Google by betraying the rights of and Athena Health's obligations to Plaintiffs and Class Members.

### G. Athena Health's Secret Google Source Code Improperly Disclosed Plaintiffs' and Class Members' Protected Health Information to Google Systematically Throughout the Class Period.

108. The intentional design and operation of Athena Health's Patient Portals to improperly and surreptitiously disclose Plaintiffs' and Class Members' Protected Health Information to Google, as described above and throughout this Complaint, was ongoing, consistent, and systematic throughout the Class Period.

109. Athena Health's Patient Portals did in fact operate as described above and throughout this Complaint with respect to the named Plaintiffs in this matter.

110. For example, Plaintiff Jane Doe has used the Athena Health Patient Portal for more than four years in connection with healthcare provided by Capita Health. Plaintiff Jane Doe has sought medical care from Capital Health in connection with deep vein thrombosis and diabetes. Plaintiff Jane also sees her primary care physician through Capital Health.

111. Since becoming a registered user of the Athena Health Patient Portal, Plaintiff Jane Doe has regularly logged into the Athena Health Patient Portal and used the Patient Portal to message doctors in connection with her deep vein thrombosis and diabetes treatment, review treatment information, and review lab results and doctor's notes. When using the Athena Health Patient Portal, Plaintiff Jane Doe entered data inside the Patient Portal related to her deep vein thrombosis and diabetes conditions that was shared with Google via the analytics technologies that Athena Health deployed inside the Patient Portal and its Mobile Application. Athena Health likewise sent Google data such as her patient status, the location of Plaintiff Jane Doe's treaters, the names of her physicians, when she logged in and out of the Patient Portal, when she reviewed health records, and her physician's specialties.

112. As a result of Athena Health's deployment of Google Analytics inside its Patient Portal, Google was able to link Plaintiff Jane Does's Protected Health Information with her real-world identity, including by linking this data to her Google account, and then used and sold her Protected Health Information for commercial purposes. For example, after entering data about her diabetes condition inside the Athena Patient Portal, Plaintiff Jane Doe began receiving advertisements on her social media account related to her medical conditions, including advertisements for diabetes treatments and compression stockings.

113. Similarly, Plaintiff John Doe has used the Athena Health Patient Portal for more than

four years in connection with healthcare services provided by Heywood Hospital in Massachusetts. Plaintiff John Doe sought medical care from Heywood Hospital in connection with ongoing treatment he has been receiving for neuropathy, a condition resulting from damage to the nerves outside the spinal cord that causes pain, numbness, tingling, and loss of coordination. Plaintiff John Doe also sees his primary care physician through Heywood Hospital.

114. Since becoming a registered user of the Athena Health Patient Portal, Plaintiff John Doe has regularly logged into the Athena Health Patient Portal and used the Patient Portal to message his doctors in connection with his neuropathy treatment, make appointments to see his doctors, review treatment information, review lab results and test results (such as EKG reports), and review doctor's notes, including notes from his primary care physician. When using the Athena Health Patient Portal, Plaintiff John Doe entered data inside the Patient Portal related to his neuropathy condition, which was then shared with Google via the analytics technologies that Athena Health deployed inside its Patient Portal. Athena Health likewise sent Google data such as his patient status, the specific hospital where John Doe was being treated, the fact that he was receiving treatment, the location of his treaters, the names of his doctors, when he logged into the Patient Portal, when he reviewed his health records, and his physicians' specialties.

115. As a result of Athena Health's deployment of Google Analytics inside its Patient Portal, Google was able to link Plaintiff John Does's Protected Health Information with his real-world identity, including by linking this data to his Google account, and then used and sold his Protected Health Information for commercial purposes. For example, after entering data about his neuropathy condition inside the Athena Health Patient Portal, Plaintiff John Doe began receiving advertisements on his social media account for neuropathy treatments.

116. Every time that Plaintiffs and Class Members accessed the Athena Health Patient Portal, Athena Health intercepted and shared their login with Google, along with other Protected Health

Information such as their patient status, their appointment scheduling, and the URLs of the pages they reviewed inside the Patient Portal, along with personally identifying information such as their IP addresses, browser fingerprints, and Google cookies. Such Protected Health Information, including Plaintiff's patient status, her medical conditions, and when and where she sought treatment are specifically protected by HIPAA against unauthorized disclosure to third parties.

117. Athena Health additionally shared Plaintiffs' and Class Members' Protected Health Information with multiple other third parties, including via analytics technologies that Athena Health deployed inside its Patient Portal from Amplitude, Microsoft Application Insights, and LaunchDarkly.

118. While Athena Health could have sought consent from Plaintiffs and Class Members to intercept, collect, and share their Protected Health Information with Google, Athena Health chose not to because of the likelihood that the majority of patients would refuse. Instead, Athena Health surreptitiously deployed hidden analytics tracking tools it obtained from Google in an effort to circumvent patients' refusing and/or blocking the exploitation of their Health Information for advertising purposes.

119. Athena Health intentionally deployed Google Analytics inside its Patient Portal (and thereby shared Plaintiff's Protected Health Information with Google) in return for access to free marketing tools and aggregated data about how individuals interacted with its Patient Portal. Athena Health took the aggregated patient data it received back from Google and used that data to optimize its marketing and product designs, thereby increasing Athena Health's profitability at the expense of Plaintiffs and Class Members.

120. Upon information and belief and the investigation of counsel, each Class Member had his or her interactions with the Patient Portals intercepted and shared with Google in a manner substantially similar to what occurred with the named Plaintiffs as detailed above, such that named Plaintiff's claims are typical of those of the proposed Class as a whole.

### H. Third Parties like Google Share the Data and Information Collected from Trackers Installed on Defendant's Website with Fourth Parties

121. In addition to using the data for their own purposes, the third parties that obtain patient data and information from trackers installed on Defendant's website further profit from Defendant's improper sharing practices by selling patients' data to fourth parties.

122. As one study found, "on average, companies that allow external sharing of [] data assets have data that has been exposed to 42 4th-party domains."[15]

123. Consequently, a fourth party that did not have a tracker directly installed on the Defendant's website may obtain and use information collected via third-party trackers to provide direct advertisements to patients on the fourth party's platform.

124. One common recipient of patients' collected data is Facebook.

125. For example, Facebook and Google have engaged in practices that allowed for the sharing or accessibility of user data between their platforms.[16] Because of this, advertisements on Facebook may reflect information collected via a Google tracker, either because of information shared directly or indirectly between the companies.

126. Facebook and Google both act as data brokers, meaning they collect data, compile it

[15] Adam Gavish, *Your 3rd Party Collaborators Share Your Company's Data with 4th Parties*, DOCONTROL (Feb. 27, 2025), https://www.docontrol.io/blog/your-3rd-party-collaborators-share-your-company-data-with-4th-parties#:~:text=What%20is%204th%2DParty%20Data,side%20effect%20of%20SaaS%20collaboration.

[16] *See* Steven Musil, *Facebook gave tech giants more access to users data than it said*, CBSNEWS (Dec. 19, 2018), https://www.cbsnews.com/news/facebook-gave-tech-giants-more-access-to-users-data-than-it-said-new-york-times/ (last visited Apr. 24, 2025); Steven Musil, *Facebook acknowledges it shared user data with dozens of companies* (Jul. 1, 2018), https://www.cnet.com/tech/tech-industry/facebook-acknowledges-it-shared-user-data-with-dozens-of-companies/ (last visited Apr. 24. 2025); Paresh Dave and Katie Paul, *Google secretly gave Facebook perks, data in ad deal* (Dec. 17, 2020), https://www.reuters.com/article/technology/google-secretly-gave-facebook-perks-data-in-ad-deal-us-states-allege-idUSKBN28Q37G/ (last visited Apr. 24, 2025).

into datasets, and sell it to third parties.[17] Two other popular data brokers are Acxiom and Oracle Data Cloud ("Oracle"). Facebook and Google have been known to buy information from, and sell information to, such data brokers.[18]

127. Because of this, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a third-party (e.g., Facebook), which uses the information to advertise for various parties (like other healthcare institutions) on its own platform.[19] Alternatively, one company's tracker (e.g., Google Analytics) may collect information, compile it into a dataset (owned by Google), and act as a data broker to sell it to a fourth-party advertiser (e.g., another healthcare institution), which uses the information to advertise for on other platforms (e.g., Facebook).[20] Or, one company's tracker (e.g., Google Analytics) may collect information, sell either the raw data or a compiled dataset to a third-party data broker (e.g., Acxiom or Oracle), which third party data broker sells the information to a fourth party (e.g., Facebook), which uses the information for still other parties' targeted advertising.[21] In any event, the basic idea and results are the same. Google Analytics tracks and discloses information to fourth parties that use that data and information to advertise a variety of products on a variety of platforms.

128. The information that data brokers like Acxiom and Oracle buy and compile from trackers (like Facebook's and Google's tackers) is inherently sensitive.

---

[17] *See* Jessie G Taft, *Facebook and Google Are the New Data Brokers* (Dec. 18, 2018, updated Jan. 5, 2021), https://dli.tech.cornell.edu/post/facebook-and-google-are-the-new-data-brokers (last visited Apr. 24. 2025).

[18] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/ (last visited Apr. 24. 2025).

[19] *See* Don Marti, *et. al.*, *Who Shares Your Information With Facebook?* at 16 (Jan. 2024), https://innovation.consumerreports.org/wp-content/uploads/2024/01/CR_Who-Shares-Your-Information-With-Facebook.pdf (explaining how Facebook uses aggregated data from external data brokers to target users on its platform).

[20] *Id.*

[21] *See* Kalev Leetaru, *The Data Brokers So Powerful Even Facebook Bought Their Data* (Apr. 05, 2018), https://www.forbes.com/sites/kalevleetaru/2018/04/05/the-data-brokers-so-powerful-even-facebook-bought-their-data-but-they-got-me-wildly-wrong/.

### I. Plaintiffs' Personal Health Data that Athena Health collected, disclosed, and exploited is Plaintiff's property, has economic value, and its illicit disclosure caused Plaintiffs harm.

129. The value of data that companies like Google extract from people who use the Internet is well understood and generally accepted in the e-commerce industry.

130. In 2013, the *Financial Times* reported that the data-broker industry profits from the trade of thousands of details about individuals, and that within that context, "age, gender and location information" were being sold for approximately "$0.50 per 1,000 people."[22]

131. In a 2021 Washington Post article, the legal scholar Dina Srinivasan said that consumers "should think of Facebook's cost as [their] data and scrutinize the power it has to set its own price."[23] This price is only increasing. According to Facebook's own financial statements, the value of the average American's data in advertising sales rose from $19 to $164 per year between 2013 and 2020.[24]

132. In June 2025, Google began soliciting individuals in the United States to purchase their computer and mobile phone internet browsing history for $540 a year per household participant.

133. Personal information is now viewed as a form of currency. Professor Paul M. Schwartz noted in the Harvard Law Review:

> Personal information is an important currency in the new millennium. The monetary value of personal data is large and still growing, and corporate America is moving quickly to profit from the trend. Companies view this information as a corporate asset and have invested heavily in software that facilitates the collection of consumer information.[25]

134. Despite the protections afforded by law, there is an active market for health information. Medical information obtained from health providers garners substantial value because of the fact that it is not generally available to third-party data marketing companies because of the strict restrictions

---

[22] https://ig.ft.com/how-much-is-your-personal-data-worth/
[23] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[24] https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/
[25] Paul M. Schwartz, *Property, Privacy and Personal Data*, 117 HARV. L. REV. 2055, 2056-57 (2004).

on disclosure of such information under state and federal laws and provider standards, including the Hippocratic oath. Even with these restrictions, however, a multi-billion-dollar market exists for the sale and purchase of such private medical information.[26]

135. Individuals can sell or monetize their own data if they so choose. For example, Facebook has offered to pay individuals for their voice recordings,[27] and has paid teenagers and adults up to $20 a month plus referral fees to install an app that allows Facebook to collect data on how individuals use their smart phones.[28]

136. Myriad other companies and apps such as DataCoup, Nielsen Computer, Killi, and UpVoice also offer consumers money in exchange for access to their personal data.[29]

137. Athena Health was compensated for its disclosures of Plaintiffs' and Class Members' Protected Health Information by the Health Information's third-party recipients in the form of enhanced analytics and marketing services. Among other things, Athena Health used the analytics data that it received from Google to enhance the Patient Portal product it marketed and sold to healthcare systems. In turn, Google used the Protected Health Information it received from Athena Health to sell advertising to other third parties, targeted to the patients whom Athena Health was supposedly serving and protecting from privacy violations.

138. Athena Health did not pay (or offer to pay) Plaintiffs and Class Members for their Protected Health Information before Athena Health shared this data with Google and other advertisers.

139. Athena Health profited from Plaintiffs' and Class Members' information without ever

[26] https://revealnews.org/blog/your-medical-data-is-for-sale-and-theres-nothing-you-can-do-about-it/; *see also https://slate.com/technology/2022/06/health-data-brokers-privacy.html*

[27] https://www.theverge.com/2020/2/20/21145584/facebook-pay-record-voice-speech-recognition-viewpoints-prounounciations-app

[28] https://www.cnbc.com/2019/01/29/facebook-paying-users-to-install-app-to-collect-data-techcrunch.html

[29] https://www.creditdonkey.com/best-apps-data-collection.html; *see also* https://www.monetha.io/blog/rewards/earn-money-from-your-data/

intending to compensate Plaintiffs and Class Members or inform them that the disclosures had been made. Athena Health was unjustly enriched by its conduct.

**J. Plaintiffs and Class Members Have a Reasonable Expectation of Privacy in Their Protected Health Information.**

140. As patients, Plaintiffs and Class Members had a reasonable expectation that Athena Health would not disclose their Protected Health Information or the content of their communications to third parties without their express authorization.

141. As patients using Athena Health's Patient Portals, Plaintiffs and Class Members had a reasonable expectation that Athena Health would not disclose their Protected Health Information or the content of their communications to third parties without their express authorization.

142. Plaintiffs' and Class Members' reasonable expectations of privacy in their Protected Health Information and communications exchanged with Athena Health are derived from multiple sources, including at least:

- Athena Health's status as Plaintiffs' and Class Members' healthcare Patient Portal provider;
- Athena Health's common law obligations to maintain the confidentiality of Protected Health Information and communications;
- State and federal laws and regulations protecting the confidentiality of Protected Health Information;
- State and federal laws protecting the confidentiality of communications and computer data;
- State laws protecting against unauthorized use of personal means of identification; and

143. It was reasonable for Plaintiffs and Class Members to assume that Athena Health's practices were consistent with Athena Health's duties to protect the confidentiality of patients' Protected Health Information.

144. Indeed, multiple studies examining the collection and disclosure of consumers' sensitive medical information confirm that the disclosure of sensitive medical information violates expectations of privacy that have been established as general social norms.

145. Privacy polls and studies also uniformly show that the overwhelming majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its customers' data.

146. For example, a recent study by *Consumer Reports* showed that 92% of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumers' data, and the same percentage believed that internet companies and websites should be required to provide consumers with a complete list of the data that has been collected about them.[30]

147. Users act consistently with these preferences. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to share data when prompted.[31]

148. "Patients are highly sensitive to disclosure of their health information," particularly because it "often involves intimate and personal facts, with a heavy emotional overlay." Peter A. Winn, *Confidentiality in Cyberspace: The HIPAA Privacy Rules and the Common Law*, 33 RUTGERS L.J. 617, 621 (2002). Unsurprisingly, empirical evidence demonstrates that "[w]hen asked, the overwhelming majority of Americans express concern about the privacy of their medical records." Sharona Hoffman & Andy Podgurski, *E-Health Hazards: Provider Liability and Electronic Health Record Systems*, 24 BERKLEY TECH L.J. 1523, 1557 (2009).

[30] https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907/
[31] https://www.wired.co.uk/article/apple-ios14-facebook

149. The concern about sharing Protected Health Information is compounded by the reality that advertisers view this type of information as particularly valuable. Indeed, having access to the data women share with their healthcare providers allows advertisers to obtain data on children before they are even born. As one recent article noted, "What is particularly worrying about this process of datafication of children is that companies like [Facebook] are harnessing and collecting multiple typologies of children's data and have the potential to store a plurality of data traces under unique ID profiles."[32]

150. Many privacy law experts have expressed serious concerns about patients' sensitive medical information being disclosed to third-party companies like Facebook and Google. As those critics have pointed out, having a patient's personal Protected Health Information disseminated in ways the patient is unaware of could have serious repercussions, including affecting their ability to obtain life insurance, how much they might pay for such coverage, the rates they might be charged on loans, and the likelihood of their being discriminated against. . As a result of Defendant's disclosure of Plaintiff's Protected Health Information to third parties without authorization via tracking technologies on its website, Plaintiff and Class Members have suffered the following injuries:

a. Loss of privacy;

b. Unauthorized disclosure of their Protected Health Information;

c. Unauthorized access of their Protected Health Information by third parties;

d. Defendant benefitted from the use of Plaintiff and Class Members' Protected Health Information without sharing that information with Plaintiff and Class Members;

e. Repeated targeted advertisements from third and fourth parties on social media and other third-party websites, reflecting Plaintiff and Class Members' Protected

---

[32] https://thereader.mitpress.mit.edu/tech-companies-are-profiling-us-from-before-birth/

Health Information that was improperly disclosed and used;

f. Lost benefit of their bargain with Defendant, as Plaintiff and Class Members did not receive the reasonable privacy and data security protections for which they paid;

g. Defendant enriched itself at Plaintiff and Class Members' expense without sharing the revenue and profit attributable to collecting their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties);

h. Defendant profited off of disclosing their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties) through savings in marketing costs;

i. Defendant profited as a result of collecting their Protected Health Information without authorization and sharing it with Third Parties (and fourth parties) through its revenues and profits attributable to serving and monetizing advertisements directed to Plaintiff and Class Members;

j. Plaintiff and Class Members lost their ability to keep their Protected Health Information private or allow Defendant to track their data;

k. Embarrassment, humiliation, frustration, and emotional distress;

l. Decreased value of their Protected Health Information;

m. Increased risk of future harm resulting from future use and disclosure of their Protected Health Information; and

n. Statutory damages.

**K. Plaintiffs' and Class Members' Protected Health Information is protected against unauthorized disclosure by both state and federal law.**

151. The confidentiality of Plaintiffs' and Class Members' Protected Health Information is

specifically protected by law. *E.g.*, N.C. Stat. § 15A-287; 45 C.F.R. § 164.514. The prohibitions against disclosing Health Information include prohibitions against disclosing personally identifiable information such as patient names, IP addresses, and other unique characteristics or codes. *E.g.*, 45 C.F.R. § 164.51. Both state and federal law also restrict the use of Plaintiffs' and Class Members' Health Information, including their status as patients, to only those uses related to their care unless patients have provided express written authorization to the contrary.

152. Athena Health does not have a legal right to share Plaintiffs' and Class Members' Protected Health Information with third parties without their written consent because this information is protected from such disclosure by law. 45 C.F.R. § 164.508. Nor is Athena Health permitted to disclose Plaintiffs' and Class Members' Protected Health Information to advertising and marketing companies like Google without express written authorization from patients. 45 C.F.R. § 164.502(a)(5)(ii).

153. Indeed, as discussed above, the United States Department of Health and Human Services ("HHS") recently confirmed that hospitals are prohibited from transmitting Health Information via tracking technology like Google Analytics without a patient's authorization and other protections like a business associate agreement with the recipient of the Health Information. Among other things, HHS warned hospitals like those for whom Athena Health provides its Patients Portals that: "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of Health Information to tracking technology vendors or any other violations of the HIPAA Rules. For example, disclosures of Health Information to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[33]

154. Athena Health failed to obtain a valid written authorization from Plaintiffs or Class

[33] https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html

Members to allow the capture and exploitation of their Protected Health Information and the contents of their communications for marketing purposes.

155. Plaintiffs' and Class Members' Protected Health Information is protected by federal law under HIPAA and its implementing regulations, which are promulgated by HHS.

156. The HIPAA Privacy Rule, located at 45 CFR Part 160 and Subparts A and E of Part 164, "establishes national standards to protect individuals' medical records and other individually identifiable health information (collectively defined as 'protected health information') and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically."[34]

157. Business associates like Athena Health also must also comply with the privacy obligations imposed by HIPAA.[35]

158. The Privacy Rule broadly defines "protected health information" ("PHI") as "individually identifiable health information" ("IIHI") that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium." 45 C.F.R. §160.103; *see* n.1, *supra*.

159. In relevant part, PHI is defined as "individually identifiable health information . . . transmitted by electronic media [or] maintained in electronic media."

160. IIHI is defined as "a subset of health information, including demographic information collected from an individual" that is: (1) "created or received by a health care provider, health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present,

[34] Department of Health and Human Services, *Health Information Privacy* (Mar. 31, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.
[35] 78 Fed. Reg. 5568 (2013) (extending certain HIPAA Privacy and Security Rules, like those described here, to business associates).

or future payment for the provision of health care to an individual"; and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. §160.103.

161. Under the HIPAA de-identification rule, "health information is not individually identifiable only if": (1) an expert "determines that the risk is very small that the information could be used, alone or in combination with other reasonably available information, by an anticipated recipient to identify an individual who is a subject of the information" and "documents the methods and results of the analysis that justify such determination'"; or (2) "the following identifiers of the individual or of relatives, employers, or household members of the individual are removed:

> A. Names;
>
> . . .
>
> H. Medical records numbers;
>
> . . .
>
> J. Account numbers;
>
> . . .
>
> M. Device identifiers and serial numbers;
>
> N. Web Universal Resource Locators (URLs);
>
> O. Internet Protocol (IP) address numbers; … and
>
> R. Any other unique identifying number, characteristics, or code…; and"
>
> the covered entity must not "have actual knowledge that the information could be used alone or in combination with other information to identify an individual who is a subject of the information."

45 C.F.R. § 164.514.

162. The HIPAA Privacy rule requires covered entities and business associates to maintain appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of protected health information without

authorization. 45 C.F.R. §§ 160.103, 164.502.

163. An individual or corporation violates the HIPAA Privacy Rule if it knowingly and in violation of 42 U.S.C. §§ 1320d-1320d-9 ("Part C"): "(1) uses or causes to be used a unique health identifier; [or] (2) obtains individually identifiable health information relating to an individual." The statute states that a "person … shall be considered to have obtained or disclosed individually identifiable health information in violation of [Part C] if the information is maintained by a covered entity … and the individual obtained or disclosed such information without authorization." 42 U.S.C. § 1320d-6.

164. Violation of 42 U.S.C. § 1320d-6 is subject to criminal penalties. 42 U.S.C. § 1320d-6(b). There is a penalty enhancement where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage, personal gain, or malicious harm." In such cases, the entity that knowingly obtains individually identifiable health information relating to an individual shall "be fined not more than $250,000, imprisoned not more than 10 years, or both."

165. Courts have recognized that patient status is protected by HIPAA. *In re Meta Pixel Healthcare Lit.*, Case No. 3:22-cv-03580-WHO, Dkt. 159 at 12 (N.D. Cal. Dec. 22, 2022) ("I agree that the information at issue here appears to show patient status and thus constitutes protected health information under HIPAA."); *id.* at 15 ("[T]he Pixel captures information that connects a particular user to a particular health care provider – i.e., patient status – which falls within the ambit of information protected under HIPAA.").

166. Guidance from HHS confirms that patient status is protected by HIPAA:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data. … **If such information was listed with health condition, health care provision** or payment

> data, **such as an indication that the individual was treated at a certain clinic**, then this information would be PHI.[36]

167. In December 2022, HHS issued a Bulletin "to highlight the obligations" of health care providers and their business associates under the HIPAA Privacy Rule "when using online tracking technologies" such as the "Meta Pixel," which "collect and analyze information about how internet users are interacting with a regulated entity's website or mobile application."[37]

168. In the Bulletin, which was amended in June 2024, HHS explained that tracking technologies on Patient Portals "generally have access to PHI" and may access diagnosis and treatment information, in addition to other sensitive data:

> Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. **Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal**. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to **only** use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[38]

---

[36] Office for Civil Rights, Department of Health and Human Services, *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule* at 5 (emphasis added) (Nov. 26, 2012), https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[37] Office of Civil Rights, Department of Health and Human Services, HHS Office of Civil Rights Issue Bulletin on Requirements under HIPAA for Online Tracking Technologies to Protect the Privacy and Security of Health Information (Dec. 1, 2022), https://www.hhs.gov/about/news/2022/12/01/hhs-office-for-civil-rights-issues-bulletin-on- requirements-under-hipaa-for-online-tracking-technologies.html.

[38] Office of Civil Rights, Department of Health and Human Services, *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last reviewed June 26, 2024)

169. The HHS Guidance further explained that tracking technology vendors like Google are considered business associates under HIPAA and that entities who use their services must obtain a business associate agreement ("BAA") before utilizing their services:[39]

> [T]racking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g*. health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[40]

170. HHS reiterated that "[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of HIPAA Rules."[41]

171. As HHS explained, an "impermissible disclosure" of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms:

> For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.[42]

---

(emphasis added).

[39] On June 20, 2024, in *American Hospital Association, et al. v. Xavier Becerra, et al.,* Case No. 4:23-cv-01110-P (N.D. Tx., Jun. 20, 2024, Doc. 67), the U.S. District Court for the Northern District of Texas vacated HHS's March 14, 2024 Bulletin as to the "Proscribed Combination," *but* acknowledged that the Proscribed Combination could be PHI in certain circumstances.

[40] *Id.*

[41] *Id.*

[42] *Id.*

## TOLLING, CONCEALMENT, AND ESTOPPEL

172. The applicable statutes of limitation have been tolled because of Athena Health's knowing and active concealment and denial of the facts alleged herein.

173. Athena Health seamlessly incorporated trackers into its Patient Portals and Mobile Application, providing no indication to Plaintiffs and Class Members that they were being tracked for marketing purposes. As a health care provider, Athena Health owed Plaintiffs and Class Members fiduciary duties, including duties to protect their health information from unauthorized disclosure. Athena Health had knowledge that its Patient Portals and Mobile Application incorporated tracking technologies yet failed to disclose that by interacting with the Patient Portals, Plaintiffs' and Class Members' Protected Health Information would be intercepted, collected, used by, and disclosed to Google. Athena Health's fraudulent concealment of its efforts to share Protected Health Information with Google (including information that specifically identified patients' real-world identities) violated the duties that Athena Health owed Plaintiffs and Class Members, tolling the statute of limitations.

174. Plaintiffs and Class Members could not, with due diligence, discover the full scope of Athena Health's conduct, because there were no disclosures or other indication that they were interacting with Patient Portals employing Google Analytics.

175. All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. Additionally, Athena Health was under a duty to disclose the nature and significance of its data collection practices but did not do so. Athena Health is therefore estopped from relying on any statute of limitations defenses.

## CLASS ACTION ALLEGATIONS

176. Plaintiffs re-allege and incorporate by reference the allegations set forth above.

177. Plaintiffs bring this action as a nationwide class action pursuant to Rules 23(a), 23(b)(2), and (b)(3) of the Federal Rules of Civil Procedure, on behalf of the following class:

> **The Nationwide Class:** During the fullest period allowable by law, all patients in the United States who logged into the Patient Portals and/or the Mobile Applications provided by Athena Health where Google Analytics, Firebase Analytics, or similar third-party analytics code was deployed.
>
> **The Massachusetts Class:** During the fullest period allowable by law, all Massachusetts citizens who logged into Patient Portals and/or the Mobile Applications provided by Athena Health where Google Analytics, Firebase Analytics, or similar third-party analytics code was deployed.

178. Excluded from the Class are Athena Health and any of its members, affiliates, parents, subsidiaries, officers, directors, employees, successors, or assigns; and the Court staff assigned to this case and their immediate family members. Plaintiffs reserve the right to modify or amend the Class definition, as appropriate, during the course of this litigation.

179. This action has been brought and may properly be maintained on behalf of the Class proposed herein under the criteria of Rule 23 of the Federal Rules of Civil Procedure.

180. **Numerosity—Federal Rule of Civil Procedure 23(a)(1)** – Class Members are so numerous that their individual joinder is impracticable. The precise number of Class Members and their identities are unknown to Plaintiffs at this time but will be determined through discovery through the records of Athena Health.

181. **Commonality and Predominance—Federal Rules of Civil Procedure 23(a)(2) and 23(b)(3)** – Common questions of law and fact exist and predominate over questions affecting only individual Class Members. These common legal and factual questions include the following:

a. Whether Athena Health's practices relating to disclosures of Plaintiffs' and Class Members' Protected Health Information to third parties were intentional;

b. Whether Athena Health profited from disclosures to the third parties;

c. Whether Athena Health's conduct violates the Electronic

Communications Privacy Act, 18 U.S.C. § 2510, *et seq.* and 18 U.S.C. § 2701, *et seq.*;

d. Whether Athena Health's practices constitute an unauthorized intrusion upon seclusion;

e. Whether Athena Health's practices constitute identity theft;

f. Whether Athena Health's practices constitute a breach of fiduciary duty;

g. Whether Athena Health's practices constitute tampering with computer data;

h. Whether Athena Health's practices constitute unjust enrichment;

i. Whether placement of the Google cookies disguised as belonging to Athena Health on Plaintiffs' and Class Members' computing devices is a highly offensive intrusion upon seclusion;

j. Whether Athena Health's conduct harmed and continues to harm Plaintiffs and Class Members, and if so, the extent of the injury;

k. Whether and to what extent Plaintiffs and Class Members are entitled to damages and other monetary relief;

l. Whether and to what extent Plaintiffs and Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction; and

m. Whether and to what extent Plaintiffs and Class Members are entitled to attorneys' fees and costs.

182. **Typicality—Federal Rule of Civil Procedure 23(a)(3)** – Plaintiff's claims are typical of the claims of the Class and Plaintiffs has substantially the same interest in this matter as other Class Members. Plaintiffs have no interests that are antagonistic to, or in conflict with, the interests of

the other Class Members. Plaintiffs' claims arise out of the same set of facts and conduct as all other Class Members. Plaintiffs and all Class Members are patients who used Athena Health Patient Portals and are victims of Athena Health's unauthorized disclosures to third parties. All Plaintiffs' and Class Members' claims are based on Athena Health's wrongful conduct and unauthorized disclosures.

183. **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4)** – Plaintiffs will fairly and adequately protect the interests of Class Members. Plaintiffs have retained competent counsel experienced in complex class action privacy litigation and Plaintiffs will prosecute this action vigorously. Plaintiffs have no interests adverse or antagonistic to those of the Class.

184. **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2)** – Athena Health acted or refused to act on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and/or declaratory relief, as described below.

185. **Superiority—Federal Rule of Civil Procedure 23(b)(3)** – A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class Members are small compared with the burden and expense that would be entailed by individual litigation of their claims against Athena Health. It would thus be virtually impossible for the Class Members, on an individual basis, to obtain effective redress for the wrongs done them. Furthermore, even if Class Members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

186. Additionally, the Class may be certified under Rule 23(b)(1) or (b)(2) because:

a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Athena Health;

b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and/or

c. Athena Health has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class Members as a whole.

**COUNT I**

**VIOLATION OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT**
**18 U.S.C. § 2511(1) et seq.**
**Unauthorized Interception, Use, and Disclosure**

170. Plaintiffs, individually and on behalf of the other Class Members, repeat and reallege the foregoing paragraphs as if fully alleged herein.

171. Title I of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2510, also known as the Wiretap Act, provides a private cause of action against any person who intercepts an electronic communication.

172. The ECPA protects individuals against eavesdropping committed with an improper purpose.

173. A violation of the ECPA occurs where any person "intentionally intercepts, endeavors

to intercept, or procures any other person to intercept or endeavor to intercept, any . . . electronic communication" or "intentionally discloses, or endeavors to disclose, to any other person the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication" or "intentionally uses, or endeavors to use, the contents of any . . . electronic communication, knowing or having reason to know that the information was obtained through the [unlawful] interception of a[n] . . . electronic communication." 18 U.S.C. §§ 2511(1)(a), (c)-(d).

187. Plaintiffs' and Class Members' communications via Patient Portals, including their communications with their treating physicians, are covered communications under the ECPA.

188. The ECPA protects both the sending and receipt of electronic communications.

189. The ECPA provides a private right of action to any person whose electronic communications are "intercepted, disclosed, or intentionally used" in violation of the ECPA.

190. "Electronic communication" means "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." 18 U.S.C. § 2510(12).

191. The transmissions of data between Plaintiffs and Class Members, on the one hand, and their healthcare providers' Patient Portals, which are hosted by Athena Health, on the other, qualify as communications under the ECPA.

192. "Intercept" under the ECPA means "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

193. "Contents" includes "*any* information relating to the substance, purport, or meaning" of the communication at issue. 18 U.S.C. § 2510(8) (emphasis added).

194. The "contents" of Plaintiffs' and Class Members' electronic communications included at least:

a. the parties to the communications;

b. the precise text of their search queries;

c. personally identifiable information such as their IP addresses, Google IDs, browser fingerprints, and other unique identifiers;

d. the precise text of their communications about specific doctors;

e. the precise text of their communications about specific medical conditions;

f. the precise text of their communications about specific treatments;

g. the precise text of their communications about scheduling appointments with medical providers;

h. the precise text of their communications about billing and payment;

i. the precise text of specific buttons on Athena Health's portal that they clicked to exchange communications, including Logins, Registrations, Requests for Appointments, and other buttons;

j. the precise dates and times when they clicked to Log-In on Athena Health's portal;

k. the precise dates and times when they visited Athena Health's portal;

l. information that is a general summary or informs third parties of the general subject of communications that Athena Health sent back to them in response to requests for information about specific doctors, conditions, treatments, billing, payment, and other information; and

m. any other content that Athena Health has aided third parties in scraping from webpages or communication forms in its Patient Portals.

195. Plaintiffs' and Class Members' communications with their healthcare providers via Athena Health constitute "electronic communications" because they were wholly or partially transmitted by wire, electromagnetic, and/or photoelectronic systems including, but not limited to:

a. Plaintiffs and Class Members' personal computing devices;

b. Plaintiffs and Class Members' web browsers;

c. Plaintiffs and Class Members' browser-managed files;

d. Plaintiffs and Class Members' mobile applications;

e. Google Analytics;

f. Internet cookies;

g. Athena Health's computer servers; and

h. Third-party source code used by Athena Health.

196. Whenever Plaintiffs and Class Members interacted with Athena Health's Patient Portals and Mobile Application, Athena Health, through the source code it embedded and ran on its Patient Portals and Mobile Application, intentionally intercepted and divulged the contents of Plaintiffs and Class Members' electronic communications while those communications were in transmission, to persons or entities other than an addressee or intended recipient of such communication, including Google.

197. Without Plaintiffs' and Class Members' knowledge or consent, Athena Health acquired the content of Plaintiffs' and Class Members' communications while they were still exchanging communications with their healthcare providers inside the Patient Portal and Mobile Application. Athena Health then caused these same communications to be disclosed to Google and third parties in return for marketing and advertising benefits.

198. In violation of 42 U.S.C. § 1320d-6, Athena Health knowingly disclosed "individually identifiable health information to another person"—i.e., Google. Athena Health further violated 42 U.S.C. § 1320d-6 by intentionally disclosing Plaintiffs' and Class Members' Protected Health Information to Google for the purpose of obtaining "commercial advantage" over its rivals in the marketplace such as Epic, Athena Health, and Athena Health Health. Specifically, Athena Health shared Plaintiffs' and Class Members' Protected Health Information with Google in return for free advertising and marketing tools from Google, along with aggregated patient data, that Athena Health used to optimize its Patient Portals and marketing campaigns, so that Athena Health could increase its profitability. By exploiting Plaintiffs' and Class Members' Protected Health Information in this manner, Athena Health hoped to take market share away from its business rivals in the patient portal market.

199. Google, in turn, used the Protected Health Information it received from Athena Health to sell targeted advertising to other third parties. While that bargain may have enriched Google and Athena Health, it came at the expense of Plaintiffs and Class Members.

200. When a patient makes contact with an Athena Health Patient Portal to exchange communications with his or her health care provider, a "TLS handshake" occurs that opens a line between the patient's communications device and the Patient Portal server. The line remains open and communications continue to flow back and forth from the patient's communications device and Athena Health's servers. The patient's communications with his or her healthcare provider flow through this open line. At the same time that the line is open and communications remain "in transit" between the patient's communications device and Athena Health's servers, Athena Health has also placed the content of the communication in temporary electronic storage and long-term storage, rendering a communication in transit, electronic storage, and storage all at the same time.

201. Athena Health was not a party to many of the communications that it intercepted and

disclosed. For example, when Plaintiffs and Class Members sent messages to their health care providers or paid their healthcare providers bills, they were not communicating with Athena Health. Rather, Plaintiffs and Class Members were communicating directly with their doctors without any knowledge that Athena Health was secretly intercepting, recording, and disclosing their communications.

202. Athena Health's conduct occurred through the use of "devices" within the meaning of the ECPA, 18 U.S.C. § 2510(5), including:

a. Cookies, including the Google cookies disguised as Athena Health's cookies;

b. Healthcare providers' web servers;

c. Google's web servers;

d. The Athena Health Mobile Application;

e. Athena Health's web servers; and

f. The Google source code described herein.

203. The ECPA provides that a "party to the communication" may liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. § 2511(2)(d).

204. Neither Athena Health nor Google were parties to Plaintiffs' and Class Members' communications with their healthcare providers.

205. But even if Athena Health was a party to the communications, Athena Health is still liable under the ECPA because it acted with the purpose of committing criminal and tortious acts in violation of federal and state laws, including but not limited to:

a. A criminal violation of 42 U.S.C. § 1320d-6 regardless of any subsequent purpose or use of the individually identifiable health data; and

b. A violation of HIPAA, particularly 42 U.S.C. § 1320d-6, which is a

criminal offense punishable by fine or imprisonment with increased penalties where "the offense is committed with intent to sell, transfer, or use individually identifiable health information for commercial advantage [or] personal gain."

c. A knowing breach of Athena Health's fiduciary duties to Plaintiffs and the Class.

206. Athena Health accessed and obtained Plaintiffs' and Class Members' Protected Health Information for the purpose of committing the crimes and torts described herein. More specifically, Athena Health intercepted Plaintiffs' and Class Members' communications so it could share those communication with Google and other third parties in return for advertising and marketing benefits. This intended and intentional disclosure violated both federal and state laws as set out above. Athena Health would not have been able to obtain these advertising or marketing services if it had complied with those laws. Moreover, Athena Health knew that its conduct was illegal under HIPAA. On information and belief, Athena Health's own internal (i.e., non-public) policies expressly recognized and acknowledged that it violates HIPAA to disclose patient health information to third parties in conjunction with identifiers such as IP addresses, URLs, medical record numbers, and other identifiers. Despite these internal policies, Athena Health nevertheless shared such information with Google via analytics technologies for the purpose of surreptitiously violating HIPAA without patients' knowledge or consent.

207. Athena Health acted without Plaintiffs' or Class Members' consent.

208. Athena Health acted without the consent of Plaintiffs' or Class Members' healthcare providers.

209. Although Plaintiffs and Class Members consented to Athena Health acquiring their Health Information for purposes of providing medical care and access to their health records, Plaintiffs

and Class Members did not consent to Athena Health acquiring their Health Information for purposes of re-directing it to Google or exploiting it for marketing purposes.

210. As such, Defendant cannot viably claim any exception to ECPA liability.

211. As a direct and proximate result of Athena Health's violation of the ECPA, Plaintiffs and Class Members were damaged by Athena Health's conduct:

a. Athena Health harmed Plaintiffs' and Class Members' interest in privacy;

b. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is private no longer;

c. Athena Health eroded the essential confidential nature of the provider-patient relationship;

d. Athena Health took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' authorization, informed consent, or knowledge, and without sharing the benefit;

e. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included their healthcare providers' duty to maintain confidentiality; and

f. Athena Health's actions diminished the value of Plaintiffs and Class Members' Protected Health Information.

212. In violating the ECPA, Athena Health's conduct was a knowing, conscious, and deliberate wrongdoing, and carried out with an evil or wrongful motive, an intent to injure Plaintiff, and a recklessly negligent or callous indifference to Plaintiffs' and Class Members' protected rights under both state and federal law. Indeed, Athena Health not only intentionally harmed Plaintiffs and Class Members without just cause but also acted with a deliberate and flagrant disregard for their safety and privacy. Specifically:

a. Athena Health knew it had a duty to safeguard and keep confidential Plaintiffs' and Class Members' Protected Health Information under HIPAA;

b. Athena Health knew that Plaintiffs and Class Members reasonably

expected their communications with their healthcare providers to remain private;

c. Athena Health knew that Plaintiffs' and Class Members' communications involved private and sensitive matters concerning Plaintiffs' and Class Members' healthcare;

d. Athena Health knew it was prohibited by law from intercepting and disclosing Plaintiffs' and Class Members' communications;

e. Athena Health knew that Google used the patient data that it was receiving via Google Analytics for marketing purposes;

f. Athena Health knew that it was required to sign a business associate agreement with any tracking technology vendor with whom Athena Health was sharing patient data;

g. Athena Health knew that its use of the tracking technology at issue violated its duties under HIPAA, as set forth in the December 2022 HHS Bulletin;

h. Athena Health nonetheless knowingly and deliberately intercepted and disclosed to third-party advertisers Plaintiffs' and Class Members' Protected Health Information without Plaintiff's or and Class Members' consent, in a knowing violation of the ECPA;

i. Athena Health carried out its unlawful conduct with the wrongful and evil motive to appropriate Plaintiffs' and Class Members' private Protected Health Information at Plaintiffs' and Class Members' expense and for Athena Health's own financial gain; and

j. Athena Health's conduct was particularly egregious and reprehensible

because it acquired Plaintiffs' and Class Members' Protected Health Information under the guise of offering healthcare services to Plaintiffs and Class Members.

213. The ECPA provides that persons whose electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119 may recover statutory damages of the greater of $100 a day for each day of violation or $10,000. 18 U.S.C. § 2520.

214. The harm being suffered by Plaintiffs and Class Members is ongoing because—as of the time of the filing of this complaint—Athena Health continues to deploy Firebase Analytics on the Mobile Application it offers the public.

215. Plaintiffs, individually, on behalf of the Class Members, seek all monetary and non-monetary relief allowed by law, including actual damages, statutory damages, punitive damages, preliminary and other equitable or declaratory relief, and attorneys' fees and costs.

**COUNT II**

**Invasion of Privacy in Violation of G.L. c. 214, § 1B**
**(On Behalf of Plaintiff and the Massachusetts Class)**

216. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

217. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

218. G.L. c. 214, § 1B (the "Massachusetts Right to Privacy Act") provides that "a person shall have a right against unreasonable, substantial, or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages."

219. The Massachusetts Right to Privacy Act provides a statutory remedy for claims traditionally asserted at common law under the torts of public disclosure of private facts and intrusion upon seclusion.

220. Undisclosed electronic surveillance violates the Massachusetts Right to Privacy Act. The improper electronic surveillance is made worse by the duty health care providers owe their patients, which Defendants violated, not to disclose private communications with or medical information about a patient without a patient's informed consent.

221. G.L. c. 111, § 70E provides that every patient or resident of a Massachusetts health care facility shall have the right to "confidentiality of all records and communications to the extent provided by law."

222. Maintaining the confidentiality of the doctor-patient relationship is a cardinal rule of the medical profession which has come to be justifiably relied on by patients seeking advice and treatments.

223. Plaintiffs and Class Members are patients of Defendant.

224. Defendant owes Plaintiffs and Class Members a duty of confidentiality.

225. Despite its duty not to disclose patient communications and Protected Health Information without informed consent and written authorization, Defendant disclosed such communications and information relating to Plaintiffs and Class Members' medical treatment to third parties without their knowledge, consent, or authorization.

226. The information disclosed included personally identifiable information, Plaintiffs' and Class Members' patient status and the exact contents of communications exchanged between Plaintiffs and/or Class Members with their doctors and with Defendant, including but not limited to information about treating doctors, potential doctors, conditions, treatments, appointments, search terms, bill payment, and logins to Defendant's website.

227. The disclosure of personally identifiable medical information constitutes an unreasonable, substantial, and serious interference with Plaintiffs and Class Members' rights to privacy.

228. Plaintiffs and Class Members did not consent to, authorize, or know about Defendant's disclosure of their Protected Health Information to Google and other third parties at the time it occurred. Plaintiffs and Class Members never agreed that their communications with healthcare providers or their sensitive medical information could be collected, used, and monetized by Google.

229. Defendant's intentional disclosure of patients' private communications and Protected Health Information to a third-party advertising company like Google without consent would be highly offensive to a reasonable person. Plaintiffs and Class Members reasonably expected that their Protected Health Information would not be collected, used, and monetized by third-party advertising companies.

230. Defendant's disclosure of Protected Health Information from thousands of individuals was highly offensive because it violated expectations of privacy that have been established by social norms. Privacy polls and studies show that Americans believe that one of the most important privacy rights is the need for an individual's affirmative consent before their personal data is collected, shared, or used.

231. Given the nature of the private communications and Protected Health Information that Defendant disclosed to Google, such as patients' identifies, doctor's names, the search terms used to locate doctors (i.e., "Alzheimer's"), medications, and details about upcoming doctor's appointments, this kind of intrusion would be (and in fact is) highly offensive to a reasonable person.

232. To be clear, Defendant's facilitation of undisclosed electronic surveillance of Plaintiffs and Class Members further supports a claim under G.L. c. 214, § 1B, even independent of the medically sensitive nature of the communications intercepted. That is, Plaintiffs' claim under the

Massachusetts Right to Privacy Act does not depend upon the contents of any intercepted communications being medical in nature or protected by any particular statutory provision.

233. Defendant's breach caused Plaintiffs and Class Members, at minimum, the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Protected Health Information; and

e. Defendant's actions diminished the value of Plaintiffs' and Class Members' personal information.

234. Plaintiffs and Class Members have suffered harm and injury, including but not limited to the invasion of their privacy rights.

235. Plaintiffs and Class Members have been damaged as a direct and proximate result of Defendant's invasion of their privacy and are entitled to seek just compensation, including monetary damages.

236. Plaintiffs and Class Members seek appropriate relief for their injuries, including but not limited to damages that will reasonably compensate Plaintiffs and Class Members for the harm to

their privacy interests as well as a disgorgement of profits made by Defendant as a result of its intrusions on Plaintiffs and Class Members' privacy.

237. Plaintiffs and Class Members are also entitled to punitive damages resulting from the malicious, willful, and intentional nature of Defendant's actions, which caused injury to Plaintiffs and Class Members in conscious disregard of their rights. Such damages are needed to deter Defendant from engaging in such conduct in the future.

238. Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

**COUNT III**
**Breach of Fiduciary Duty and/or Common Law Duty of Confidentiality**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

239. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

240. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

241. All conditions precedent to this action have been performed or occurred.

242. In *Alberts v. Devine*, 479 N.E.2d 113, 120 (1985), the Massachusetts Supreme Court held that a duty of confidentiality arises from the physician-patient relationship and that a violation of that duty gives rise to a cause of action sounding in tort.

243. As a healthcare provider for Plaintiffs and Class Members, Defendant owed Plaintiffs and Class Members a fiduciary duty of confidentiality in the data and content of communications exchanged between Defendant and Plaintiffs and Class Members.

244. Defendant solicited and invited Plaintiffs and Class Members to communicate with Defendant and to provide their Protected Health Information as part of Defendant's regular business practices. By soliciting and collecting Plaintiffs and Class Members Protected Health Information,

Athena Health also incurred an obligation to protect that information against unauthorized disclosure to third parties.

245. Instead of safeguarding Plaintiffs' and Class Members' Protected Health Information, Defendant intentionally shared that information with Google and other third parties, including Amplitude, Microsoft, and LaunchDarkly.

246. Consumers of healthcare value their privacy, the privacy of their dependents, and the ability to keep private their healthcare-related communications and Private Health Information associated with obtaining healthcare. To customers such as Plaintiffs and Class Members, healthcare that allows third parties to secretly collect their healthcare communications and Private Health Information without consent is fundamentally less useful and less valuable than healthcare that refrains from such practices.

247. Plaintiffs and Class Members would not have used Athena Health's Patient Portals or Mobile Application if they knew that Athena Health would share their Protected Health Information with Google without their knowledge or written consent.

248. Defendant breached its duty of confidentiality by disclosing Protected Health Information about Plaintiffs and Class Members, including their status as patients, the content of their communications, and information about their doctors, potential doctors, conditions, treatments, appointments, search terms, and bill payment.

249. Defendant also materially breached its obligation to protect Plaintiffs' and Class Members' non-public communications and Protected Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Defendant (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Protected Health Information without consent to third-party advertising companies like Google, (2) failed to implement adequate reviews of the

software code and java script installed on its websites to ensure that patients' Protected Health Information was not being automatically routed without consent to third party advertising companies like Google, (3) failed to provide adequate notice to the public that visitors to its websites risked having their Protected Health Information shared with third party advertising companies like Google, (4) failed to take other industry standard privacy protection measures such as providing a "cookie" acceptance button on its website homepages, (5) failed to provide visitors to its websites with a means to opt out of the automatic transfer of data regarding their website interactions to third party advertising companies like Google, (6) failed to implement internal policies and educational programs to ensure that Defendant's website managers and coders were familiar with the legal regulations governing the disclosure patient Protected Health Information to third parties, and (7) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' Protected Health Information to third party advertising companies like Google.

250. The services that Defendant offers are available from many other health care systems that do protect the confidentiality of patient communications. Had Defendant disclosed that it would allow third parties to secretly collect Plaintiffs' and Class Members' Protected Health Information without consent, neither the Plaintiffs, the Class Members, nor any reasonable person would have used Athena Health's services.

251. Defendant's conduct in sharing Plaintiffs' and Class Members' Protected Health Information with Google also diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class Members shared with Defendant (which Defendant then shared with Google). Indeed, Google itself has offered to pay the public to acquire similar information in the past so that Google could use such information for marketing purposes. Plaintiffs and Class Members were harmed both by the dissemination of their Protected Health Information and by losing the sales value of that information.

252. As a direct and proximate result of these failures, Plaintiffs and Class Members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Protected Health Information, and the diminution in value of their Protected Health Information.

253. Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result.

254. Defendant's breach caused Plaintiffs and Class Members the following damages:

a. Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b. Defendant eroded the essential confidential nature of the doctor-patient and provider-patient relationship;

c. Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value;

d. Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain the confidentiality of their Protected Health Information; and

e. Defendant's actions diminished the value of Plaintiffs and Class Members' personal information.

**COUNT IV**
**Breach of Implied-in-Fact Contract**
**(On Behalf of Plaintiffs and the National Class)**

255. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

256. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

257. No express written contract exits between Plaintiffs and Class Members, on the one hand, and Athena Health on the other.

258. Under Massachusetts law, an implied-in-fact contract comes into being when, notwithstanding the absence of a written agreement or verbal agreement expressing mutual obligations, the conduct or relations of the parties imply the existence of a contract. *Popponesset Beach Ass'n, Inc. v. Marchillo*, 39 Mass. App. Ct. 586, 592, 658 N.E.2d 983, 987 (1996).

259. Athena Health solicited and invited Plaintiffs and Class members to provide their Protected Health Information via interactions with Athena Health's password protected Patient Portal as part of Athena Health's regular business practices. Plaintiffs and Class members accepted Athena Health's offers and provided their Protected Health Information to Athena Health as part of acquiring Athena Health's medical services.

260. The very nature of the password-protected Patient Portal that Athena Health offered patients evinced an implied promise by Athena Health that Plaintiffs and Class Members health information would be protected from unauthorized disclosures—not shared with Google and countless other third parties for the purposes of exploiting that health information.

261. By encouraging Plaintiffs and Class Members to share their Protected Health Information within a password-protected Patient Portal, Athena Health's conduct manifested an implied promise to maintain the confidentiality of Plaintiffs' and Class Members' Protected Health Information.

262. In furnishing Athena Health with their Protected Health Information via a password-protected Patient Portal, Plaintiffs and Class Members entered into an implied-in-fact contract with

Athena Health to retain and protect the privacy of their Protected Health Information from unauthorized disclosure to third parties such as Google.

263. Athena Health required and obtained Plaintiffs' and Class members' personal health information as part of the physician-patient relationship, evincing an implicit promise by Athena Health to act reasonably to protect the confidentiality of Plaintiffs' and Class members' Protected Health Information.

264. Implied in the exchange was a promise by Athena Health to ensure that the personal health information of Plaintiffs and Class members in their possession would only be used for medical treatment purposes and would not be shared with third parties such as Google without the knowledge or consent of Plaintiffs and Class members. By asking for and obtaining Plaintiffs' and Class members' personal health information, Athena Health assented to protecting the confidentiality of that information. Athena Health's implicit agreement to safeguard the confidentiality of Plaintiffs' and Class members' Protected Health Information was necessary to effectuate the contract between the parties.

265. Plaintiffs and Class members provided their personal health information in reliance on Athena Health's implied-in-fact promise that this information would not be shared with Google without their consent.

266. In entering into such implied contracts, Plaintiffs and Class members reasonably believed and expected that Athena Health would comply with applicable laws and regulations governing the disclosure of such information and that Athena Health would not allow Google to collect and exploit their communications with Athena Health without their consent.

267. It is clear by these exchanges that the parties intended to enter into an agreement and mutual assent occurred. Plaintiffs and Class members would not have disclosed their Protected Health Information to Athena Health but for the prospect of Athena Health's implied

promise to protect the confidentiality of their Protected Health Information. Conversely, Athena Health presumably would not have taken Plaintiffs and Class members' Protected Health Information (much less offered a password-protected Patient Portal) if it did not intend to provide them with this benefit.

268. Athena Health was therefore required to reasonably safeguard and protect the personal health information of Plaintiffs and Class members from unauthorized disclosure and/or use by Google.

269. Plaintiffs and Class members accepted Athena Health's medical services offer and fully performed their obligations under the implied contract with Athena Health by providing their Protected Health Information to Athena Health. Plaintiffs and Class members would not have provided and entrusted their Protected Health Information to Athena Health in the absence of their implied contracts with Athena Health and would have instead retained the opportunity to control their Protected Health Information for uses other than the benefits offered by Athena Health.

270. Plaintiffs and Class members relied on Athena Health's implied-in-fact promise to safeguard their Protected Health Information to their detriment. Athena Health breached the implied contracts with Plaintiffs and Class members by failing to reasonably safeguard and protect Plaintiffs' and Class members' Protected Health Information from disclosure to Google and other third parties.

271. Athena Health's failure to implement adequate measures to protect the personal health information of Plaintiffs and Class members and Athena Health's intentional disclosure of the same to Google violated the purpose of the agreement between the parties: Plaintiffs' and Class members' provision of money and personal health information in exchange for medical services and other benefits.

272. Instead of safeguarding Plaintiffs' and Class members' Protected Health Information, Athena Health intentionally shared that information with Google thereby breaching the implied contracts it had with Plaintiffs and Class members.

273. Plaintiffs and Class Members reasonably believed and expected that Athena Health would operate its password-protected Patient Portal and Mobile Application free of surreptitious collection and exploitation of patients' communications and health data. Athena Health failed to do so. Plaintiffs and Class members would not have used Athena Health's Patient Portals if they knew that Athena Health would share their Protected Health Information with Google without their knowledge or written consent.

274. Both the provision of medical services, including access to medical records, and the protection of Plaintiffs' and Class members' Protected Health Information were material aspects of these implied-in-fact contracts.

275. A meeting of the minds occurred when Plaintiffs and the Class members agreed to, and did, provide their Protected Health Information to Athena Health and/or their affiliated healthcare providers inside the Athena Health password-protected Patient Portal and Mobile Application.

276. Plaintiffs and the Class members performed their obligations under the contract when they paid for their healthcare services and provided their Protected Health Information. Plaintiffs and Class Members reasonably assumed that the monies being paid on their behalf via their healthcare providers to Athena Health would be used, in part, to protect their Protected Health Information against unauthorized disclosure to Google.

277. Athena Health materially breached their contractual obligation to protect the nonpublic Protected Health Information that Athena Health gathered when it allowed Google and other third parties to collect and exploit that information from inside a password protected

Patient Portal and Mobile Application without Plaintiffs' and Class members' consent.

278. Athena Health also materially breached its implied-in-fact contractual obligation to protect Plaintiffs' and Class members' non-public Protected Health Information when it failed to implement adequate security measures and policies to protect the confidentiality of that information. For example, on information and belief, Athena Health (1) failed to implement internal policies and procedures prohibiting the disclosure of patients' Protected Health Information without consent to third-party advertising companies like Google, (2) failed to implement adequate reviews of the software code and java script installed on its Patient Portal and Mobile Application to ensure that patients' Protected Health Information was not being automatically routed without consent to third party advertising companies like Google, (3) failed to implement internal policies and educational programs to ensure that Athena Health's website managers and coders were familiar with the legal regulations governing the disclosure patient personal health information to third parties, and (4) failed to install adequate firewalls or take similar measures to prevent the automatic routing of patients' personal health information to third party advertising companies like Google from inside Athena Health's password protected Patient Portal and Mobile Application.

279. As a result of Athena Health's failure to fulfill the data privacy obligations it impliedly agreed to, Plaintiffs and Class members did not receive the full benefit of their bargains, and instead received healthcare and other services that were of a diminished value compared to what they were entitled to.

280. The medical services that Athena Health offers are available from many other health care systems who do protect the confidentiality of patient communications. Had Athena Health disclosed that it would allow Google to secretly collect Plaintiffs' and Class members' Protected Health Information from inside its password protected Patient Portal, neither the

Plaintiffs, the Class members, nor any reasonable person would used the Patient Portal provided by from Athena Health.

281. Athena Health's conduct in sharing Plaintiffs' and Class members' personal health information with Google diminished the sales value of that information. There is a robust market for the type of information that Plaintiffs and Class members shared with Athena Health (which Athena Health then shared with Google). Indeed, Google itself has offered to pay the public to acquire similar information in the past so that Google could use such information for marketing purposes. Plaintiffs and Class members were harmed both by the dissemination of their personal health information and by losing the sales value of that information.

282. As a direct and proximate result of these failures, Plaintiffs and the Class members have been harmed and have suffered, and will continue to suffer, actual damages and injuries, including, without limitation, the release and disclosure of their Private Health Information, the loss of control of their Private Health Information, and the loss of the benefit of the bargain they had struck with Athena Health.

283. Plaintiffs and the Class members are entitled to compensatory and consequential damages suffered as a result.

**COUNT V**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

284. Plaintiffs plead this cause of action in the alternative to their claim for breach of implied in fact contract.

285. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

286. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

287. Plaintiffs and Class Members conferred a benefit on Defendant in the form of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private, and Defendant appreciated this benefit.

288. Defendant gained access to the Protected Health Information provided by Plaintiffs and Class Members by (1) knowingly concealing its use of pixel tracking technologies from the public; (2) failing to provide industry standard privacy safeguards for its patients' health information; (3) intentionally disregarding years of warnings from the United States Department of Health and Human Services that it was obligated to protect its patients' Protected Health Information from unauthorized disclosures to third parties; and (4) intentionally violating Massachusetts law.

289. Athena Health benefited from the use of Plaintiffs' and Class Members' private communications and Protected Health Information and unjustly retained those benefits at their expense.

290. Athena Health collected, used, and disclosed this information for their own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Specifically, Athena Health bartered Plaintiffs' and Class Members' Protected Health Information to Google and Google in return for both advertising benefits and "free" website analytics information. What's more, by sharing its patients' Protected Health Information with Google, Defendant gained the ability to utilize Google's customized audiences and targeted advertising features, which saved Defendant substantial revenues by making advertising far less expensive than it would have been otherwise. Defendant also gained access to free website analytics data, which it otherwise would have had to spend substantial amounts of money to provide for itself.

291. Plaintiffs and Class Members would not have used the Athena Health's services if they had known that Defendant would collect, use, and disclose this information to third parties like Google.

292. Defendant exceeded any authorization given and instead consciously disclosed and used this information for its own gain, providing Defendant with economic, intangible, and other benefits, including substantial monetary compensation.

293. Google is not a charity. Google was willing to provide Defendant with "free" analytics benefits only because the patient health data that Defendant surreptitiously shared with those companies has an economic value many times in excess of the analytics services that Google and Google provided Defendant.

294. Defendant's decision to intentionally mislead Plaintiffs and Class Members about its use of pixel tracking technologies for its own financial benefit is a textbook example of an "unjust" enrichment.

295. Defendant unjustly retained those benefits at the expense of Plaintiffs and Class Members because Defendant's conduct damaged Plaintiffs and Class Members, all without providing any commensurate compensation to Plaintiffs and Class Members.

296. Plaintiffs were aware of the economic value of their Protected Health Information and reasonably expected to be compensated by any party who shared or accessed their Protected Health Information to sell advertising. Plaintiffs and Class Members did not consent to Defendant giving their health information away for free.

297. By engaging in the acts and failures to act described in this Complaint, Defendant have been knowingly enriched by the savings in costs that should have been reasonably expended to protect the PII and PHI of the Plaintiffs and the Class. Defendant was on notice that patients' Protected Health Information was protected by law; that patients' Protected Health Information had substantial monetary value; that cyber criminals and advertising companies were highly desirous of obtaining access to its patients' Protected Health Information, yet failed to take reasonable steps to

pay for the level of data security and privacy training that would have presented the unauthorized disclosure of patients' Protected Health Information to Google and other third parties.

298. The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

299. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds that Defendant received, and such other relief as the Court may deem just and proper.

**COUNT VI**
**Negligence**
**(On Behalf of Plaintiffs and the Massachusetts Class)**

300. Plaintiffs re-allege and incorporate by reference all paragraphs above as if fully set forth herein.

301. Plaintiffs bring this claim on behalf of themselves and all members of the Massachusetts Class.

302. Upon accepting, storing, and controlling the Private Information of Plaintiffs and the Class, Defendants owed a duty to Plaintiffs and the Class to exercise reasonable care to secure, safeguard, and protect their highly sensitive Private Information.

303. Defendant breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' Private Information from unauthorized disclosure.

304. It was reasonably foreseeable that Defendant's failures to exercise reasonable care in safeguarding and protecting Plaintiffs and Class Members' Private Information through their tracking technologies would result in unauthorized third parties gaining access to such Protected Health Information for no lawful purpose.

305. Defendant's duty of care to use reasonable measures to secure and safeguard Plaintiffs and Class Members' Private Information arose due to the special relationship between Defendant and its patients, which is recognized by statute, regulations, industry ethical rules (including the AMA rules described above), and the common law.

306. In addition, Defendant had a duty under state (M.G.L. c. 111 § 70E) and HIPAA privacy laws, which the Massachusetts legislature and Congress enacted to protect the confidentiality of clients' healthcare information, set strict conditions under which providers may use such information, and limit to whom providers can disclose such information.

307. Defendant's conduct also created a foreseeable risk of harm to Plaintiffs and Class Members and their Private Information. Defendant's misconduct included the failure to (i) secure Plaintiffs and Class Members' Private Information; (ii) comply with industry-standard data security practices; (iii) implement adequate website and event monitoring; and (iv) implement the systems, policies, and procedures necessary to prevent unauthorized disclosures resulting from the use of tracking technologies.

308. Defendant's wrongful actions and/ or inactions and the resulting unauthorized disclosure of Plaintiffs and Class Members' Private Information constituted negligence at common law.

309. Accordingly, Plaintiffs, individually and on behalf of members of the Class, seek compensatory damages (including damages to compensate for the injuries above), plus costs and attorneys' fees.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of the other Class Members, respectfully request relief against Athena Health as set forth below:

a. Certifying the Class and appointing Plaintiffs as the Class's representative;

b. Finding that Athena Health's conduct as alleged herein was unlawful;

c. Awarding such injunctive and other equitable relief as the Court deems just and proper, including, but not limited to, enjoining Athena Health from making any further disclosure of Plaintiffs and Class Members' communications to third parties without the Plaintiffs and Class Members' express, informed, and written consent; requiring Athena Health to implement adequate procedures for ensuring the confidentiality of patients' health information; mandating that Athena Health hire third-party monitors for a period of at least three years to ensure that the these steps have been taken; and mandating that Athena Health provide written verifications on a quarterly basis to the court and counsel for Plaintiffs and Class Members in the form of a declaration under oath that the above steps.

d. Awarding statutory damages of $5,000 per violation for Athena Health's violation of the Electronic Communications Privacy Act;

e. Imposing a constructive trust against Defendant through which Plaintiffs and Class Members can be compensated for any unjust enrichment gained by Defendant;

f. Awarding Plaintiffs and Class Members statutory, actual, compensatory, consequential, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

g. Awarding Plaintiffs and Class Members pre-judgment and post-judgment interest as provided by law;

h. Awarding Plaintiffs and Class Members reasonable attorney's fees, costs, and expenses;

i. Awarding costs of suit; and

j. Such other and further relief to which Plaintiffs and Class Members may be entitled.

Dated: August 8, 2025

Respectfully submitted,

By: /s/ Michael Appel
Michael S. Appel, BBO #543898
**KETTERER, BROWNE & ASSOCIATES, LLC**
336 South Main Street
Bel Air, Maryland 21014
Telephone: (617) 359-4981
michael@KBAattorneys.com

J. Gerard Stranch (*pro hac vice* forthcoming)
Emily Schiller (*pro hac vice* forthcoming)
**STRANCH, JENNINGS, & GARVEY, PLLC**
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
gstranch@stranchlaw.com
eschiller@stranchlaw.com

Lynn A. Toops (*pro hac vice* forthcoming)
**COHEN & MALAD, LLP**
One Indiana Square, #1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
ltoops@cohenandmalad.com

Foster C. Johnson (*pro hac vice* forthcoming)
Joseph Amhad (*pro hac vice* forthcoming)
Thomas Fraser (*pro hac vice* forthcoming)
**Ahmad, Zavitsanos, & Mensing, PLLC**
1221 McKinney Street, Suite 3460
Houston TX 77010
(713) 655-1101
fjohnson@azalaw.com
ahmad@azalaw.com
tfrashier@azalaw.com

Raina C. Borrelli (*pro hac vice* forthcoming)
**STRAUSS BORRELLI PLLC**
980 N Michigan Avenue
Suite 1610
Chicago, IL 60611
Telephone: (872) 263-110
Facsimile: (608) 509-4423
sam@straussborrelli.com

raina@straussborrelli.com

**COUNSEL FOR PLAINTIFF, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED**